Georgiana A. WIXSON; Edith M. Muti-
mura; Kenneth Wixson; Charles Mu-
timura, Plaintiffs–Appellants,

v.

DOWAGIAC NURSING HOME; Borgess
Health Care Alliance; Sandra Gardner;
Local 951 United Food and Commercial
Workers, Defendants–Appellees.

No. 94–2373.

United States Court of Appeals,
Sixth Circuit.

Argued March 18, 1996.

Decided June 19, 1996.

Robert A. Yingst (argued and briefed),
Holly F. Underwood, Boothby, Ziprick &
Yingst, Berrien Springs, MI, for Georgiana

A. Wixson, Edith M. Mutimura, Kenneth Wixson.

Holly F. Underwood, Boothby, Ziprick & Yingst, Berrien Springs, MI, for Charles Mutimura.

Barry R. Smith, Craig H. Lubben (argued and breifed), Nancy Stevenson Rubino, Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for Dowagiac Nursing Home.

Craig H. Lubben, Nancy Stevenson Rubino, Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for Borgess Health Care Alliance, Sandra Gardner.

Ronald L. Rahal (briefed), Kalniz, Iorio & Feldstein, Toledo, OH, for Local 951 of the United Food and Commercial Workers Intern. Union, AFL–CIO and CLC.

Before: LIVELY, MARTIN, and MOORE, Circuit Judges.

LIVELY, Circuit Judge.

This is an appeal by the plaintiffs from summary judgment for the defendants in an action charging the defendants with unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 et seq. (Title VII), the Michigan Elliott–Larsen Civil Rights Act (Elliott–Larsen), M.C.L.A. § 37.2101 et seq., and 42 U.S.C. §§ 1981, 1985 and 1986. The plaintiffs are former employees of the defendant Dowagiac Nursing Home (DNH) who are covered under a collective bargaining agreement with the defendant Local 951 United Food and Commercial Workers (the union). For the reasons that follow, we affirm the judgment of the district court.

## I.

Ms. Wixson and Ms. Mutimura were employed as nurses' aides by DNH. They brought this action after being discharged, naming as defendants DNH, the union, a corporation related to DNH and Sandra Gardner, the assistant director of DNH. Ms. Wixson's and Ms. Mutimura's husbands joined as plaintiffs, seeking damages for loss of consortium.

## A.

Ms. Wixson, who is white, worked at DNH for about ten years prior to her discharge in 1992. She received occasional discipline reports prior to March 1992, when she met with some DNH administrators to express her concerns about alleged discrimination against African employees of DNH. Following the meeting, at which DNH representatives said they would "take care of things," Ms. Wixson received a series of increasingly severe discipline reports. Ms. Wixson filed grievances in some cases and did not contest the reports in others. Several of her grievances were ultimately resolved in her favor. In July 1992, at Ms. Wixson's request, the union filed a grievance on behalf of her entire shift, alleging that the shift had been singled out for stricter performance requirements and was being monitored by a supervisor. The union eventually withdrew the grievance because of Ms. Wixson's refusal to cooperate.

DNH discharged Ms. Wixson on October 1, 1992, following an incident that DNH treated as a violation of the right of privacy and confidentiality of a resident of the nursing home. According to Ms. Wixson, an elderly female resident told her that a man had come into her room from off the street and "touched her private parts." Ms. Wixson also claimed the woman told her she had reported the incident to Ms. Wixson's supervisor, Terry Ackerman, and that Mr. Ackerman advised the resident not to say anything and assured her that he would take care of it.

Ms. Wixson did not report the conversation with the resident to anyone at the nursing home; however, she did tell her husband, who had no connection with the nursing home. About a month after the incident, Ms. Wixson and her husband sought out the son of the resident who claimed to have been assaulted and told him of the conversation. The Wixsons indicated to the resident's son that DNH was covering up the incident. This statement was incorrect. The record shows that Mr. Ackerman called the son immediately after the incident and reported it to one or more government agencies. The resident's son filed an affidavit in this case stating that he was already aware of the allegation his mother had made before the

Wixsons came to see him and that he had discussed the situation with the nursing home's administration.

**B.**

Ms. Mutimura is a black African national. She worked at DNH for two years prior to her termination. During her tenure, she received fifteen employee discipline reports. Six of these reports involved incidents of tardiness, which Ms. Mutimura attributed to "problems with transportation." One of the reports indicated that she had been late 36 times. She also received a discipline report for leaving a patient in bed with the side rail down, which is a violation of company policy. Ms. Mutimura filed a grievance for the side rail incident, which was resolved in her favor. In February 1993, she was suspended without pay for three days after she left another patient unattended with the side rail down. Ms. Mutimura filed a grievance claiming other aides frequently violated this rule without being disciplined. DNH agreed to provide back pay and to remove the report if Ms. Mutimura undertook a three-hour safety training course on her own time.

In March 1993, Ms. Mutimura received a discipline report for reading non-work-related material during her shift, and DNH suspended Ms. Mutimura without pay for an indefinite period. She filed a grievance, asserting that while her actions violated company policy, non-African employees were not disciplined for the same infraction. The record indicates, however, that at least one white nurses' aide was disciplined for reading during work hours.

The settlement of this grievance called for Ms. Mutimura to be transferred to a different shift, and provided that she would receive no back pay but would retain her seniority. Further, it stated that a notice would be placed in her file stating that she would "be expected to perform at a satisfactory level according to policies and standards of DNH" and that any further infractions would result in her discharge. After reading the proposal, Ms. Mutimura stated that she would have a day care problem with her new shift. DNH offered Ms. Mutimura assistance in obtaining day care and advised her that she

could pick the day for her return to work. Ms. Mutimura signed the agreement reluctantly, she said. The language directly above the signature line states:

I have willingly and freely accepted the above specified settlement. I further agree to waive any further action against my employer as it relates to the above listed matter.

I hereby state that Local 951 has fully and fairly represented me in this matter to the best of my knowledge and I have knowingly waived any arbitration or further proceeding of such claims and/or grievances.

Pursuant to the agreement, Ms. Mutimura was scheduled to return to work at 7:00 a.m. on April 12, 1993. On that day, instead of reporting for work, she requested two weeks' vacation. The director of nursing denied the request and asked when Ms. Mutimura would be able to return to work. Ms. Mutimura responded, "maybe two weeks" and indicated she still did not have a babysitter. The director offered to provide a list of licensed babysitters; however, Ms. Mutimura declined the assistance because her husband would only allow an African to watch their children. Ms. Mutimura was advised that if she did not return to work on April 14, she would be terminated for insubordination and refusing a work assignment. On April 14, Ms. Mutimura did not return to work as instructed, and the director sent a letter to Ms. Mutimura confirming the phone conversation and advising that she was terminated as of that date.

**II.**

The district court held a hearing on the defendants' motions for summary judgment after the parties had filed memoranda in support of and in opposition to the motions. The parties filed numerous affidavits, as well as several depositions as attachments to their memoranda. At the hearing, all counsel were given full opportunity to present their views and to advise the court of the evidence in support of their respective positions. The court took the matter under advisement and issued its decision a short while later. In its

memorandum and order the court discussed each plaintiff's claim separately before surveying the applicable law.

## A.

The district court found that Ms. Wixson failed to establish a prima facie case of retaliatory discharge because she did not demonstrate a causal connection between her termination and her complaints about alleged discriminatory treatment of African employees by DNH. Several months elapsed between these complaints and her discharge. The court acknowledged that Ms. Wixson produced evidence that she was disciplined more frequently and more severely after she complained about the treatment of the Africans. Nevertheless, the court found that even if her evidence were deemed sufficient to establish a prima facie case of retaliation, the plaintiff failed to carry her ultimate burden of showing that her discharge was in retaliation for her activities in support of her African co-workers.

The court then found that even if Ms. Wixson made a prima facie case, DNH produced evidence that Ms. Wixson was discharged for a legitimate, nondiscriminatory reason—violation of a nursing home policy, known to her, against breaching a resident's right to privacy and confidentiality. The court concluded that Ms. Wixson's disclosure to her husband of the resident's allegations and failure to report them to the nursing home administration violated important policies, and provided ample reason for her immediate termination. The district court further found that Ms. Wixson produced no evidence that DNH used these violations as pretexts for discharging her. Though Ms. Wixson's attorney argued at the hearing that the reason given by DNH was pretextual, she could only support this claim on the basis of an inference that DNH was out to get rid of the plaintiff because of her championing of the African employees' cause.

## B.

The district court found that Ms. Mutimura established a prima facie case, but that DNH successfully rebutted the presumption of unlawful discrimination by articulating a legitimate, nondiscriminatory reason for terminating her employment—failure to accept a work assignment. Ms. Mutimura refused to abide by her agreement to return to work by a certain date and, according to DNH, this was the reason she was discharged. In the face of this clearly articulated reason for her discharge, the district court found that Ms. Mutimura failed to produce evidence of pretext sufficient to require submission of her claims to a jury. Ms. Mutimura produced no evidence explicitly addressing the question of pretext, but merely argued that the evidence of some past disparate treatment of African employees proved that DNH was out to get rid of her.

## C.

Applying familiar case law, the district court concluded that the failure of both plaintiffs to carry their burden of offering sufficient proof to establish pretext by a preponderance of the evidence required summary judgment on their claims against the defendants under Title VII and Elliott–Larsen. The plaintiffs had previously advised the court that they were dropping their Title VII claims against the union.

The court also held that the plaintiffs could not succeed in their claims under 42 U.S.C. § 1981 because their discharges did not involve contract formation or rights guaranteed by a contract. In addition, the court concluded that the plaintiffs could prevail on their conspiracy claims under 42 U.S.C. § 1985 and § 1986 only if they established substantive violations. Having found no such violations, the district court held these claims should be dismissed as part of its summary judgment. Because the husbands' claims were derivative of the failed claims of their wives, these claims were dismissed as well.

## III.

The principal contention of both plaintiffs on appeal is that the district court erred by relying too heavily on the events surrounding their actual discharges by DNH. Ms. Wixson asserts that DNH's retaliation against her escalated from the time she first complained of the alleged discrimination against

African employees until her termination. She argues that there was a "pervasive hostile environment" in the workplace prior to her discharge, and that DNH seized on the incident concerning the female resident as a pretext for firing her.

Ms. Mutimura argues that the district court ignored evidence showing that DNH systematically discriminated against her and other African employees. She contends that her alleged insubordination in not reporting for work as required by the settlement agreement was not the real reason for her termination.

The plaintiffs filed many affidavits with their written responses to the defendants' motions for summary judgment. They referred to some of these affidavits at the district court hearing on the motions and have directed our attention to them on appeal. They argue that the totality of the evidence, when viewed in a light most favorable to them, reveals evidence of unlawful employment practices sufficient to defeat a motion for summary judgment and to require a trial on the merits.

## IV.

### A.

■■■ In a recent opinion, Judge Boggs succinctly described this court's role when reviewing a district court order granting summary judgment:

This court reviews *de novo* the district court's grant of the defendants' motion for summary judgment. *Baggs v. Eagle–Picher Indus., Inc.,* 957 F.2d 268, 271 (6th Cir.), *cert. denied,* 506 U.S. 975, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). This court will affirm the district court's order only if we determine that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). We view all evidence before us in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

*Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994).

### B.

■■■ We begin our analysis with a brief review of the burden-shifting process in a Title VII case, first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and so carefully described by Justice Powell in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine,* the Court stated that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." 450 U.S. at 253, 101 S.Ct. at 1094. The effect of a plaintiff's establishing a prima facie case is to create "a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254, 101 S.Ct. at 1094. This is a rebuttable presumption, which shifts to the defendant the burden of producing evidence that the complained-of adverse action was taken against the employee for a legitimate, nondiscriminatory reason. Although the defendant is not required to convince the court that proffered reasons actually motivated its actions, it "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [discharge]." *Id.* at 254–55, 101 S.Ct. at 1094. (footnote omitted). Thus, the defendant's burden is one of production, not of persuasion. Once the defendant meets its burden of production, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Id.* at 255, 101 S.Ct. at 1094–95. (footnote omitted). Be-

cause the plaintiff has the ultimate burden of persuasion, she must be given a "full and fair opportunity to demonstrate pretext." *Id.* at 256, 101 S.Ct. at 1095. The plaintiff may successfully carry her burden of persuading the court that she has been the victim of intentional discrimination in either of two ways. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

 In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court interpreted *Burdine* to hold that a plaintiff does not discharge her ultimate burden of persuasion by merely convincing the trier of fact that the defendant's proffered reasons are pretextual. In addition, there must be a finding that "the employer's action was the product of unlawful discrimination...." 509 U.S. at 514, 113 S.Ct. at 2751. As we explained in *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994):

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals [for the Eighth Circuit] was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required.*"

*Id.* (quoting *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749).

### C.

We need not decide whether the plaintiffs made out prima facie cases. The Supreme Court stated in *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983):

> Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie

case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff."

*Id.* at 715, 103 S.Ct. at 1481–82 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); see also *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2748–49 (once the defendant has succeeded in carrying its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant"). The defendants in the present case carried their burden of production when they "clearly set forth, through the introduction of admissible evidence, the reasons for the [plaintiffs' discharges]." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094.

 The Supreme Court decisions cited herein discussed the respective burdens of the parties and the task of the trial court where there is a full-dress trial. Our task is to apply the same rules in a case where there has been no trial because the district court granted summary judgment. This requires us to determine whether the plaintiffs had a "full and fair opportunity to demonstrate pretext," *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, and to demonstrate intentional discrimination by the defendants.

 Our review of the record convinces us that the plaintiffs were given this "full and fair opportunity." They filed responses to the defendants' motions for summary judgment with numerous attachments. At the hearing on the motions, the district judge gave plaintiffs' counsel every opportunity to identify facts disclosed in the depositions, affidavits and other documents in the record which demonstrated both that the reasons given by the defendants for the plaintiffs' discharges were pretextual and that the plaintiffs were victims of unlawful discrimination. The plaintiffs did not seek to offer any new evidence, but argued that the evidence previously submitted was sufficient. They were not required to introduce new evidence, but could rely on evidence previously produced to establish prima facie cases in their effort to show that the defendants' explanations were pretextual. *Kraus v. Sobel Cor-*

*rugated Containers, Inc.,* 915 F.2d 227, 230 (6th Cir.1990) (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10).

Both plaintiffs viewed their previously produced evidence as demonstrating a pervasive pattern of racial discrimination sufficient to carry their burden after the defendants had successfully rebutted any presumptions of discrimination. Obviously, this is a difficult showing to make without new evidence, but as Justice Powell pointed out in footnote 10 of *Burdine,* "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." 450 U.S. at 255, 101 S.Ct. at 1095.

The plaintiffs admitted the facts upon which DNH said it relied in discharging them, but appear to argue on appeal both that these facts were not sufficient to cause their discharges and that the incidents involving Ms. Wixson's disclosure of confidential patient information and Ms. Mutimura's insubordination in failing to return to work at the agreed time were not the actual motivating factors in their discharges.

## V.

We have conducted the required de novo review, giving careful attention to the affidavits of Ms. Wixson and Ms. Mutimura, and others specifically relied upon by the plaintiffs as establishing the existence of genuine issues of material fact. Viewed in a light most favorable to the plaintiffs, the probative evidence demonstrates some hostility toward the African employees by white employees other than Ms. Wixson. It does not, however, identify any incident where a similarly situated white employee was treated differently by DNH than an African employee for the same rule infraction. Nor does it show that DNH retaliated against Ms. Wixson. There are numerous charges of disparate treatment and hostile work environment that are made in general, conclusory terms, but names, times and occasions are missing. In fact, the affidavits are filled with statements of the subjective beliefs of the affiants that DNH was hostile to its African employees and treated them differently from other employees.

■ DNH's evidence, on the other hand, fully documents the incidents which it claims led it to discharge the plaintiffs. There is no dispute about these incidents. Although the plaintiffs seek to minimize the seriousness of the incidents, neither denies that the occurrences relied upon by DNH actually took place. Nor can either deny that these incidents were grounds for discharge; they merely contend that, given the past problematic relationship between them and DNH, a trier of fact could reasonably conclude that the reasons given by DNH were pretextual and that they were discharged for other unlawful reasons—Ms. Mutimura because of her race and Ms. Wixson in retaliation for her complaints about alleged discrimination by DNH against its African employees.

■ Applying the standards enunciated in cases discussed above, we conclude that neither plaintiff met her burden of producing evidence from which a jury could reasonably conclude that the reason given by DNH for her termination was pretextual and that she was actually discharged for prohibited reasons. Furthermore, the record is devoid of any probative evidence that the union discriminated against either plaintiff. Union representatives accepted and pursued grievances filed by the plaintiffs and nothing in the record indicates the existence of a conspiracy between the union and the plaintiffs' employer to discriminate against the plaintiffs in any way. We find no serious attempt by the plaintiffs to substantiate their claims against the union.

We do not base our decision on the failure by the plaintiffs to introduce new evidence of unlawful discrimination in seeking to show that the reasons given by DNH were pretextual. Rather, in agreement with the district judge, we conclude that all the evidence presented, together with inferences reasonably drawn from it, and interpreted as the plaintiffs contended it should have been interpreted, provided an insufficient basis for a trier of fact to make the required findings by a preponderance of the evidence. Therefore, the district court properly granted summary judgment on the Title VII and Elliott–Larsen claims.

Further, the district court did not err in dismissing the § 1981 claim or the conspiracy claims based on 42 U.S.C. §§ 1985 and 1986, which fell with the finding of no discrimination or retaliation. Similarly, the derivative loss of consortium claims failed as well.

**AFFIRMED.**