# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-3000

_____

Carla Rodgers,

        Appellant,

v.

U.S. Bank, N.A.,

        Appellee.

Appeal from the United States
District Court for the
Western District of Missouri.

_____

Submitted: April 15, 2005
Filed: August 5, 2005 **(corrected August 11, 2005)**

_____

Before MELLOY, COLLOTON and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Carla Rodgers ("Rodgers") appeals the decision of the district court[1] granting summary judgment to U.S. Bank, N.A. ("U.S. Bank"), on her claims of employment discrimination based on race under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Missouri Human Rights Act. We agree with Rodgers that she established a prima facie case of racial discrimination. However, because we

_____

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

conclude that Rodgers failed to raise a triable question of material fact as to whether U.S. Bank's legitimate nondiscriminatory reason for her termination was a pretext for discrimination, we affirm the district court.

## I.    BACKGROUND

Rodgers, an African-American woman, was employed at the Picture Hills Branch of U.S. Bank as a drive-through teller for approximately eleven months in 2002.  When Rodgers joined U.S. Bank, she received the employee handbook and attended three days of teller training.  The employee handbook contains a number of policies, including U.S. Bank's policy prohibiting employees from processing transactions on their own accounts and its policy on progressive discipline.[2]  Rodgers was trained on the proper way to do a "multi" transaction–a type of transaction in which a teller processes a combination of transactions for a customer.  She also was trained on the bank's policy against employees processing transactions on their own accounts.

In November 2002, a suspicious-activity report generated by U.S. Bank's Loss Prevention Group triggered an investigation into Rodgers's account activity.  Suspicious-activity reports identify transactions where the last name of the customer matches the last name of the employee performing the transaction.  The reports are then reviewed and analyzed by loss-prevention analysts in the Employee Fraud Detection Group.

Rodgers's suspicious-activity report showed that she had processed five transactions on one of her personal bank accounts involving credits of more than

---

[2]The progressive-discipline policy provides for progressive discipline "when appropriate."  It also provides that "[i]n some cases, U.S. Bancorp may determine immediate termination is warranted."

$35,000. Many of the credits appeared to come from CD/IRA or Loan in Process accounts. Rodgers did not have any of these accounts and, as a drive-through teller, never processed transactions on these types of accounts. A subsequent investigation revealed four additional suspicious transactions, including a credit to her account in the amount of $620,003.14. Because there was no paper support for these transactions, they washed out of the system at the end of each day, and Rodgers never tried to remove money from her account while credits were posted there.

A loss-prevention analyst contacted Beth Money, East Region District Manager, and Jan Scaletta, Human Resources Manager, and asked that they follow up on the report. Money and Scaletta passed along the information to Pathe Price, corporate security investigator for U.S. Bank. Price, along with Vickie Gabbert, District Operations Manager, conducted the investigation.

Price and Gabbert interviewed Rodgers as part of their investigation. Rodgers explained that she had used her account number to get out of a multi-transaction when she entered the function accidentally and continued to enter data. Although there are other ways to get out of the multi-transaction function, Rodgers used her account number to "zero out" the transaction. Rodgers further explained that she did not believe there was anything wrong with this procedure because she had been taught the "trick" by a senior teller, Kathy Nichols. Although she offered to show them the mistakes on the keyboard, neither investigator had her do so.

Price and Gabbert did not find Rodgers's explanation credible for several reasons. First, the multi-transaction function could not be entered in the manner Rodgers described. Rodgers said that she had entered the multi-transaction function accidentally by hitting the enter key twice, but the function can only be entered by hitting another particular key on the keyboard. The investigators also had difficulty locating a corresponding transaction which Rodgers would have zeroed out with the transactions she processed on her account. In addition, several of the transactions

Rodgers processed, such as CDs and loans, were not normally handled by drive-through tellers. There were other suspicious circumstances, including the presence of an overdraft-fee waiver on Rodgers's account, which was not permitted, and the fact that Rodgers had repeatedly checked her account balance on one of the days on which she processed some of the erroneous transactions.[3] Price formed the opinion that Rodgers was testing the bank's computer system by putting money into her account and seeing if anything would "stick."

Price and Gabbert reported their findings and opinions to Jennifer Crim, the branch manager. Crim discussed the findings with her manager, Money. Based on the information obtained during the investigation, Money recommended that Rodgers be terminated. Crim agreed with Money's recommendation because she, like Price and Gabbert, did not find Rodgers's explanation to be credible. As a result, Crim terminated Rodgers's employment because she believed the risk associated with the suspicious transactions was too great to allow Rodgers to continue her employment.

The investigators did not interview Nichols because she was on vacation during U.S. Bank's investigation of Rodgers. However, as a result of Rodgers's explanation that she had learned from Nichols that she could use her account number to "zero out" a transaction, U.S. Bank conducted a follow-up investigation of Nichols. Nichols had been a teller at U.S. Bank and its predecessors for more than seventeen years. Shortly before the investigation of Rodgers, Nichols had been placed on written "final notice" for violating a U.S. Bank dual-control security policy which prohibits one person

---

[3]Rodgers asserts that the most likely reason for checking her balance the first time that day was to see if her paycheck had been deposited, and the reason for the other times she checked was probably to joke with the other tellers about her large account balance because of the back-out transactions.

from having both the key and the combination to a vault.[4]

The Employee Fraud Detection Group investigated Nichols's account activity to determine whether she had used her own account number for any transactions. Investigators found one such transaction. However, in contrast to Rodgers's account activity, they were able to determine how Nichols had gotten to the point where she found it necessary to use her account number and the specific transaction she was attempting to reverse. Additionally, Nichols immediately reversed the transaction on her own account rather than allowing it to wash out at the end of the day. The branch manager found Nichols's explanation to be credible and did not discipline her.

Rodgers filed a complaint against U.S. Bank alleging that her termination constituted racial discrimination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Missouri Human Rights Act. Specifically, she alleged that she suffered disparate treatment based on race when she was terminated for violating the same U.S. Bank policy as Nichols, a white employee who was not disciplined for violating the policy. U.S. Bank moved for summary judgment. The district court granted U.S. Bank's motion, concluding that Rodgers did not establish a prima facie case of racial discrimination. Rodgers now appeals.

---

[4]Nichols was placed on final notice for a period of ninety days. The notice indicated that during the 90-day period, Nichols was expected to meet the following conditions: (1) no further violations of teller and security procedures; and (2) all teller duties and other areas of performance must meet standards. The notice stated that "[f]ailure to meet these expectations at anytime within the 90-day period may result in further disciplinary action up to and including termination."

## II.     DISCUSSION

### A.     Introduction

We review the district court's grant of summary judgment to U.S. Bank de novo. *Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Randolph v. Rodgers*, 170 F.3d 850, 856 (8th Cir. 1999). On summary judgment, "[t]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004). The non-moving party, however, must still "present[] evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in [her] favor." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc). "[W]e must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable" to Rodgers, the non-moving party. *Winthrop Resources*, 361 F.3d at 468. While summary judgment "should seldom be utilized" in employment discrimination cases, *Stidham v. Minnesota Mining & Mfg., Inc.*, 399 F.3d 935, 937 (8th Cir. 2005), "there is no 'discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999).

In this case, we employ the familiar *McDonnell Douglas* burden-shifting framework. *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 720 (8th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973)). "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden

of production." *Pope*, 406 F.3d at 1006-07 (citations omitted). Once the plaintiff establishes a prima facie case of discrimination, "[i]t then falls to the employer to promulgate a non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)). If the employer meets its burden, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Pope*, 406 F.3d at 1007. The plaintiff has the burden of persuasion at all times. *Id.*

## B.     Prima Facie Case of Discrimination

In order to establish a prima facie case of discrimination on the part of U.S. Bank, Rodgers must show that: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944-45 (8th Cir. 1994). The parties agree that Rodgers satisfies the first three elements. Rodgers can prove the fourth element by putting forth facts that similarly situated employees, who are not African-American, were treated differently. *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004).

The district court held that Rodgers failed to prove the fourth element of her prima facie case–that she and Nichols were similarly situated. The district court applied a standard articulated in *Gilmore v. AT&T*, requiring that Rodgers and Nichols be "similarly situated in all respects." 319 F.3d 1042, 1046 (8th Cir. 2003) (citing *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)). To satisfy this standard, "[t]he individuals used as comparators 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Id.* (quoting *Clark*, 218 F.3d at 918).

Applying this standard, the district court held that while Rodgers and Nichols violated the same bank policy, the degree and frequency of Rodgers's violations differed significantly from that of Nichols's single violation. The district court compared Rodgers's nine transactions involving erroneous credits in excess of $650,000 to Nichols's one erroneous transaction involving $1,200. The district court agreed with U.S. Bank that the circumstances surrounding Rodgers's transactions were suspicious. Accordingly, the district court held that "[i]t therefore cannot be said that Rodgers and Nichols 'engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Rodgers v. U.S. Bank, N.A.*, No. 03-388-CV-W-DW, slip op. at 6 (W.D. Mo. June 16, 2004) (quoting *Gilmore*, 319 F.3d at 1046). Consequently, the district court held that Rodgers failed to establish her prima facie case because Rodgers and Nichols were not similarly situated. Rodgers argues that the district court erred in concluding that she failed to establish a prima facie case of racial discrimination.

There appear to be conflicting lines of cases in our Circuit regarding the standard for determining whether employees are similarly situated at the prima facie stage of the *McDonnell Douglas* burden-shifting framework. One line sets a "low threshold" for employees to be considered similarly situated, requiring only that the employees "are involved in or accused of the same or similar conduct and are disciplined in different ways." *See Wheeler*, 360 F.3d at 857 (citing *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308-09 (8th Cir. 1994), the Court reasoned that at the prima facie stage the test for determining whether employees are similarly situated "is 'not onerous,' however at the third stage (proving pretext) it is 'rigorous'"); *see also Williams*, 14 F.3d at 1309 n.3 (noting that the meaning of "similarly situated" varies, depending on whether it is applied at the prima facie stage or pretext stage). The other line, upon which the district court relied, is more rigorous at the prima facie stage and requires that the employees must be "similarly situated in all respects." *See*

*Gilmore*, 319 F.3d at 1046 (citing *Clark*, 218 F.3d at 918).[5]

---

[5]*Gilmore* relied on *Clark v. Runyon*. *See Gilmore*, 319 F.3d at 1046 (citing *Clark*, 218 F.3d at 918). However, *Clark's* use of a more rigorous standard at the prima facie stage appears misplaced. For example, *Clark* relied on *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968 (8th Cir. 1994), and *Lynn v. Deaconess Medical Center*, 160 F.3d 484 (8th Cir. 1998). *See Clark*, 218 F.3d at 918. *Harvey* and *Lynn*, however, used the more rigorous "similarly situated in all relevant respects" standard at the pretext stage, not the prima facie stage. *See Harvey*, 38 F.3d at 971-72; *Lynn*, 160 F.3d at 487.

We respectfully disagree with the concurring opinion's position that the definitions this Circuit has used for the term "similarly situated" at the prima facie stage–"involved in or accused of the same or similar conduct" and "similarly situated in all relevant respects"–are functionally equivalent.

For example, the Court in *Williams*, using the "involved in or accused of the same or similar conduct" definition at the prima facie stage, concluded that the plaintiff, an African-American, established his prima facie case simply because he provided evidence that he and nine white employees violated the employer's "five day letter" rule, yet he was treated differently because he was refused reinstatement. *Williams*, 14 F.3d at 1309. The employer's "five day letter" rule provided that once an employee's medical leave expired, the employee received a letter directing him either to report to work or to provide medical evidence of the need for an extension within five days of receiving the letter. Failure to respond within the five-day period resulted in immediate termination. However, the employee could apply for a reinstatement waiver, which, if granted, would allow the employee to return to work on probation. *Id.* at 1307.

In stark contrast, using the "similarly situated in all relevant respects" definition at the pretext stage, the Court in *Williams* concluded that the plaintiff failed to prove pretext because he:

> presented no evidence regarding the prior work histories of the reinstated Caucasian employees as compared to himself . . ., the respective excuses for violating the "five day letter" rule, the number of days they remained absent before returning to work, the nature or severity of their medical

When there are conflicting lines of cases in our Circuit, we can choose which line to follow. *See Kostelec v. State Farm Fire and Cas. Co.*, 64 F.3d 1220, 1228 n.8 (8th Cir. 1995) (noting that while we are not at liberty to overrule an opinion filed by another panel, we are free to choose which line of cases to follow); *United States v. Anderson*, 349 F.3d 568, 570 n.1 (8th Cir. 2003).

At the prima facie stage of the *McDonnell Douglas* burden-shifting framework, we choose to follow the low-threshold standard for determining whether employees are similarly situated. We believe this more accurately reflects Supreme Court precedent. The Supreme Court has advised: "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). We also think that using the low-threshold standard at the prima facie stage is more in line with our Court's prior admonition that "[t]he district court must not conflate the prima facie case with the ultimate issue of discrimination." *Williams*, 14 F.3d at 1308. Using a more rigorous standard at the prima facie stage would "conflate the prima facie case with the ultimate issue of discrimination," thereby effectively eliminating the burden-shifting framework the Supreme Court has directed us to use.

Under the low-threshold standard, Rodgers must show that she and Nichols were "involved in or accused of the same or similar conduct and [were] disciplined

conditions, or the extent to which their medical conditions were corroborated by independent, medical documentation. Moreover, the evidence in this case indicates that [the plaintiff] may have falsified his medical records, a circumstance not shown by [the plaintiff] to exist in other cases of reinstatement of Caucasian persons.

*Id.* at 1309-10. As exemplified in *Williams*, the different results obtained at the prima facie stage and the pretext stage demonstrate that the "involved in or accused of the same or similar conduct" definition and the "similarly situated in all relevant respects" definition are not functionally equivalent.

-10-

in different ways." *Wheeler*, 360 F.3d at 857 (quoting *Williams*, 14 F.3d at 1309). Rodgers satisfies this burden. Rodgers and Nichols are similarly situated because they both violated the same bank policy by processing transactions on their own accounts, and they were disciplined differently because Rodgers was terminated and Nichols received no punishment. As the district court points out, there are differences in the severity and frequency of their violations and the surrounding circumstances; however, these differences are relevant to the issue of whether Rodgers and Nichols are similarly situated for purposes of showing pretext. Accordingly, we hold that Rodgers has established a prima facie case of disparate treatment.

The burden of production now shifts to U.S. Bank to show that it had a legitimate, nondiscriminatory reason for terminating Rodgers. U.S. Bank's proffered reason is that Rodgers violated the bank's policy against employees processing transactions on their own accounts. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Missouri Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). Accordingly, the ultimate burden falls on Rodgers to produce evidence sufficient to create a genuine issue of material fact regarding whether U.S. Bank's proffered nondiscriminatory reason is a pretext for discrimination.

### C.    Pretext

Rodgers attempts to prove pretext with evidence of the following: (1) disparate treatment of her and similarly situated white employees; (2) an inadequate investigation into her account activity; and (3) a substantial change in U.S. Bank's legitimate non-discriminatory reason for her termination. We affirm the district court's grant of summary judgment to U.S. Bank because we conclude that Rodgers failed to raise a triable question of material fact as to whether U.S. Bank's legitimate

nondiscriminatory reason for her termination was a pretext for discrimination.[6]

### 1.    Disparate treatment

Rodgers attempts to prove disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside of her protected group. *See E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003). Specifically, Rodgers argues that she was terminated for violating the same U.S. Bank policy as Nichols, a white employee who was not disciplined for violating the policy. She also argues that only white employees benefitted from U.S. Bank's progressive discipline policy.

Rodgers has failed to show that she was similarly situated to any of these white employees. At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one. *See Wheeler*, 360 F.3d at 857; *Kohler*, 335 F.3d at 775. Rodgers must show that she and the employees outside of her protected group were similarly situated in all relevant respects. *Wheeler*, 360 F.3d at 858. "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" *Harvey*, 38 F.3d at 972-73 (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988)); *see also Wheeler*, 360 F.3d at 858 (concluding that plaintiff and white employee were not similarly situated because their actions "involved differing levels of misconduct").

Although Rodgers and Nichols violated the same bank policy, the

---

[6]We note that we "may affirm a district court's order, including an order granting summary judgment, on any basis supported by the record, even if that ground was not considered by the district court." *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003) (quoting *Viking Supply v. Nat'l Cart Co., Inc.*, 310 F.3d 1092, 1097 (8th Cir. 2002)) (internal quotation omitted).

frequency and seriousness of Rodgers's violations and the suspicious circumstances surrounding her violations set her apart. Rodgers violated U.S. Bank's policy against processing transactions on her own account nine times in ten days, resulting in over $650,000 being credited to her account. Some of these transactions were on accounts not normally handled by drive-through tellers, such as CDs and loans. Although Rodgers asserted that she was using her account to correct a mistake, the investigators were unable to ascertain from the record of her transactions what alleged mistake she was trying to correct. Rodgers also repeatedly checked her account balance on one of the days on which some of the erroneous transactions occurred. In addition, Rodgers had an impermissible overdraft-fee waiver code on her account. In contrast, Nichols's single violation involved $1,200. She reversed the transaction immediately. And the investigators could clearly follow on the record what mistake Nichols was attempting to correct. Nichols's activity did not suggest that she was testing the system to determine whether deposits that were not reversed would stay in her account. Rodgers's and Nichols's violations were not of "comparable seriousness."

When Nichols violated U.S. Bank's policy against employees processing transactions on their own accounts, she also was on final notice for violating the bank's dual-control vault security policy. Rodgers argues that this should be considered in the similarly-situated analysis in the same way a plaintiff's employment history is considered. *See, e.g.*, *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691-92 (8th Cir. 2002) (holding that the plaintiff was not similarly situated when the plaintiff had a history of similar violations and this was the other employee's first such violation). It is important to note that Nichols and two other employees were written up for violating the dual-control policy. Crim testified that these dual-control policy violations resulted from poor management and that she was not concerned about any suspicious activity on the part of the employees involved. Even if we were to accept Rodgers's argument and consider Nichols's single violation of bank policy against employees processing transactions on their own accounts in conjunction with her

final notice status, the severity of Rodgers's violations and the suspicious surrounding circumstances cause us to conclude that Rodgers and Nichols are not similarly situated in all relevant respects.

Rodgers also argues that only white employees benefitted from U.S. Bank's progressive discipline policy. She points to the fact that rather than being terminated, Nichols and two other white employees at her branch were put on final notice for violating the bank's dual-control vault security policy. She also notes that Crim, her branch manager who is white, was demoted and given written warnings for poor performance and behavior issues rather than being terminated. Rodgers has failed to show how she is similarly situated to any of these white employees. *See Lanear*, 843 F.2d at 301 ("It is not up to the employer to prove dissimilarity."). Moreover, U.S. Bank's policy does not require progressive discipline in all cases, and "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

### 2. Inadequate Investigation

Next, Rodgers attempts to prove that U.S. Bank's proffered justification for terminating her is a pretext for discrimination by arguing that U.S. Bank conducted an inadequate investigation into her account activity. She argues that Price and Gabbert did not speak with Nichols regarding her involvement in teaching her how to use her account number to "zero out" a transaction. Rodgers also points to the facts that Crim did not give her the opportunity to demonstrate the typing mistakes she asserts she made and that Crim did not contact U.S. Bank's Human Resources Department before terminating her.

-14-

This essentially boils down to an argument that the decision to terminate Rodgers was based on erroneous conclusions. The issue before the Court, however, is not whether U.S. Bank's suspicions were correct; instead, the issue is whether U.S. Bank conducted a thorough investigation and whether it made credibility determinations reasonably and in good faith. *See Pope*, 406 F.3d at 1008 (citing *Euerle-Wehle v. United Parcel Serv.*, 181 F.3d 898, 900 (8th Cir. 1999)). We conclude U.S. Bank did so. Price, Gabbert, Money and Crim considered Rodgers's explanation but found it incredible in light of the suspicious circumstances, and Rodgers has produced no evidence showing that they did not believe she was guilty of misconduct. *See Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004); *see also Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("To the extent [plaintiff's] summary judgment evidence relates to his innocence of the sexual harassment charge, it is irrelevant. He must, instead, produce evidence demonstrating that [his employer] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him . . . .").

### 3. Change in Proffered Reason

Finally, Rodgers attempts to prove pretext by arguing that U.S. Bank changed its reason for terminating her. She notes that in its MCHR/EEOC response, U.S. Bank asserted that Rodgers was terminated for violating bank policy, but later, in litigation, the bank brought up the frequency of her violations and the suspicious circumstances surrounding her violations. While it is true that "[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext," *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (1994), this does not mean that an employer cannot elaborate on its proffered reason. *See Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 835 (8th Cir. 2002). U.S. Bank has not backed off from its original reason for terminating Rodgers; rather, U.S. Bank simply points to "additional aspects" of Rodgers's violation of bank policy. *See id.* These additional aspects are relevant to U.S. Bank's argument that Rodgers and Nichols are

not similarly situated.   This is not a case of U.S. Bank changing its story.

Accordingly, Rodgers has failed to present any material evidence calling into question U.S. Bank's proffered legitimate, nondiscriminatory reason for terminating her employment.

## III.   CONCLUSION

For the foregoing reasons, we conclude that Rodgers established a prima facie case of racial discrimination.  However, because we conclude that Rodgers failed to raise a triable question of material fact as to whether U.S. Bank's legitimate nondiscriminatory reason for her termination was a pretext for discrimination, we affirm the district court.

COLLOTON, Circuit Judge, concurring in the judgment.

I concur in the judgment of the court.  It seems unnecessary, in a case like this one, to devote extensive analysis to whether the plaintiff established the elements of a prima facie case of race discrimination.   Given that U.S. Bank proffered a legitimate, non-discriminatory reason for discharging Carla Rodgers, and Rodgers presented whatever evidence she had to show that the proffered reason was a pretext for discrimination, the summary judgment record before the district court includes everything the parties would present even assuming Rodgers did make a prima facie case.  As the Supreme Court said in the context of a case that had been through trial, "[t]he prima facie case method established in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),] was never intended to be rigid, mechanized, or ritualistic," and "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).  I agree with the court that Rodgers has not

generated a genuine issue for trial on the "ultimate question of discrimination *vel non*," *id.* at 714, and that ought to be enough to resolve this appeal. *See*, *e.g.*, *George v. Leavitt*, 407 F.3d 405, 411-412 (D.C. Cir. 2005) (applying *Aikens* in summary judgment context); *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998) (same); *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 170 (6th Cir. 1996) (same).

The court, however, addresses what it describes an apparent conflict in our cases concerning the standard for determining the existence of a prima facie case in a case of alleged unlawful disparate treatment. I respectfully disagree with its conclusion on this point. The court's analysis concerns the definition of "similarly situated" employees who are offered for comparison at the prima facie stage of the *McDonnell Douglas* burden-shifting analysis. The majority labels one definition of "similarly situated" a "low-threshold standard," while the district court's definition is said to be "rigorous," and therefore incorrect. *Ante*, at 8-9. In my judgment, the divergence in definitions is more apparent than real, but to the extent there is a material difference, the standard applied by the district court is more deeply rooted in our precedents, more consistent with the law of other circuits, and more consonant with the legal presumption that accompanies the establishment of a prima facie case. Therefore, I would reaffirm our use of the district court's standard – whether the plaintiff is "similarly situated in all *relevant* respects" with the employees offered for comparison – and uphold the district court's conclusion that Rodgers did not provide sufficient evidence to raise an inference that her termination was more likely than not the result of discrimination based on race.

First, a prima facie standard that inquires whether employees are "similarly situated in all relevant respects" is more deeply rooted in our precedents. This standard was employed as early as 1992 in *Jones v. Frank*, 973 F.2d 673 (8th Cir. 1992), where we explained that Jones's claim of unlawful disparate treatment based on her sex "must rest on proof that she and the three men are 'similarly situated in all

-17-

relevant respects,'" *id*. at 676, and then held that Jones had "failed to prove a prima facie case of sex discrimination." *Id*. at 677. We have equated the phrase "similarly situated in all relevant respects" with the statement that "[e]mployees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways." *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) (internal quotation and emphasis omitted). This latter formulation of "similarly situated" dates to *Boner v. Board of Commissioners*, 674 F.2d 693 (8th Cir. 1982), where we held that a plaintiff "did not establish a prima facie case of discrimination" under this standard. *Id*. at 696, 697 (quoting *Rohde v. K.O. Steel Castings, Inc.*, 649 F.2d 317, 322 (5th Cir. 1981)). Several more recent cases have applied the standard of "similarly situated in all relevant respects" or its equivalent in determining the existence of a prima facie case. *Tatum v. City of Berkeley*, 408 F.3d 543, 553 (8th Cir. 2005) (rejecting plaintiffs' prima facie case of disparate treatment where comparator was "not similarly situated to them in one material respect"); *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003); *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 693-94 (8th Cir. 2001); *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000); *Tolen v. Ashcroft*, 377 F.3d 879, 882-83 (8th Cir. 2004) (applying *Gilmore* and *Clark*); *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037, 1038 (8th Cir. 2004) (per curiam) (applying *Clark*); *see also Philip v. Ford Motor Co.*, No. 04-1735, 2005 WL 1568285, at *3 (8th Cir. July 7, 2005) (Heaney, J., dissenting) ("Our cases require a plaintiff to show that he or she is similarly situated to employees offered for comparison in all *relevant* respects to meet the prima facie burden.") (emphasis in original).

The court seems to trace the view that we should employ a different, "low-threshold" definition of "similarly situated" in assessing a plaintiff's prima facie case to the decision in *Williams v. Ford Motor Co.*, 14 F.3d 1305 (8th Cir. 1994). I respectfully submit that a better reading of *Williams* indicates no such deviation from our precedents in *Boner* and *Jones*. *Williams* explicitly relied on *Boner* for its definition of "similarly situated," stating that "for purposes of establishing a prima

-18-

facie case we consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *See Boner v. Board of Comm'rs*, 674 F.2d 693, 697 (8th Cir. 1982)." *Id*. at 1309. *Williams* also followed the precedent of *Jones*, saying that "we analyze Williams' prima facie case according to the elements set forth in *Jones*," *id*. at 1308, and concluding that "[u]nder the *Jones* model, this court holds that Williams established a prima facie case of race discrimination." *Id*. It would be passing strange to interpret an opinion that explicitly applied the "*Jones* model" and supported its definition of "similarly situated" with a citation of *Boner* as *rejecting* the very definitions of "similarly situated" employed in *Jones* and *Boner* at the prima facie stage as too "rigorous" for use in determining the existence of a prima facie case.

I therefore respectfully disagree with the reading of *Williams* advanced in our recent opinion in *Wheeler v. Aventis Pharmaceuticals*. *Wheeler* interpreted the *Williams* definition of similarly situated, which was supported by the citation to *Boner*, and which merely paraphrased a passage from *Boner* by changing the words "same offense" to "same or similar conduct," as establishing a "low threshold." 360 F.3d at 857. *Wheeler* then introduced the notion that the definition of "similarly situated" at the pretext stage of a discrimination case is relatively "rigorous," *id*.,[7] and concluded that the very passage from *Boner* cited in *Williams* at the prima facie stage constituted a "rigorous" definition of "similarly situated" to be used only at the pretext stage. *Id*. at 858.

This interpretation of the *Williams* analysis of a prima facie case would mean that the court *cited* a so-called "rigorous" definition of "similarly situated" used at the prima facie stage in *Boner*, but then *paraphrased* the definition in order to establish

---

[7]Although *Wheeler* placed the term "rigorous" in quotation marks and followed it with a citation to *Williams*, 14 F.3d at 1308, the word "rigorous" does not appear in *Williams*.

a "low threshold" at the prima facie stage in *Williams*. We should try to read our precedents as following, rather than circumventing, our earlier decisions, and the better reading of *Williams* is that it merely applied the functional equivalent of the *Jones* and *Boner* definitions of "similarly situated," and concluded that the plaintiff in *Williams* had established a prima facie case under those legal standards. Indeed, that is how the Eleventh Circuit has interpreted *Williams*. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (equating *Williams* statement of prima facie case standard with "similarly situated in all relevant respects").[8] It turns out, therefore, that the second "conflicting line" of cases described by the court can be limited to one case decided only last year, and given the option to "choose which line to follow," *ante* at 10, we would perform a better service by returning the law of the circuit to its moorings. Even assuming the majority's view that *Williams* must be read as conflicting with *Jones* and *Boner*, *ante*, at 8 n.5, the preferable course would be to follow the earlier precedents and the majority of our cases. *See Kostelec v. State Farm Ins. Co.*, 64 F.3d 1220, 1228 n.8 (8th Cir. 1995) (explaining that panel may recognize that earliest panel decisions "properly control, as they should have controlled" in subsequent cases that created conflicting lines of precedent).

---

[8]*Williams* noted that the phrase "similarly situated" appeared in both the opinion's discussion of a prima facie case and in a discussion whether the employer's explanation for adverse action was a pretext for discrimination, and then explained that "the meaning of 'similarly situated' varies according to the context in which it is used." 14 F.3d at 1309 n.3. *Williams* did not, however, say that the meaning of the term is more or less "rigorous" at either stage of the *McDonnell Douglas* burden-shifting analysis. *Williams* may be harmonized with *Jones*, *Boner*, and our similar precedents by recognizing that the plaintiff's argument concerning "similarly situated" employees differed at the two stages of the litigation. At the prima facie stage, the plaintiff in *Williams* compared himself directly with other employees of a different race. *Id*. at 1309 & n.2. At the pretext stage, he advanced what the court called a "statistical comparison," apparently based on the relative percentages of employees of each race who were subjected to the same adverse action as the plaintiff. *Id*. at 1309.

Second, a prima facie standard of "similarly situated in all relevant respects" is used widely among our sister circuit courts of appeals. A majority of the regional circuits has applied this familiar standard or its equivalent at the prima facie stage of litigation under Title VII. *See Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004); *Sartor v. Spherion Corp.*, 388 F.3d 275, 279 (7th Cir. 2004); *Barbour v. Browner*, 181 F.3d 1342, 1345-47 (D.C. Cir. 1999); *id.* at 1354 (Tatel, J. dissenting); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998); *Martinez v. Northern Rio Arriba Elec. Coop.*, 1998 WL 45493, at *1 (10th Cir. 1998) (unpublished opinion); *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) ("To establish a prima facie case in this manner, Mayberry must show that white employees were treated differently under circumstances 'nearly identical' to his."); *Patches v. City of Phoenix*, 2003 WL 21206120, at *1 (9th Cir. 2003) (unpublished); *cf. Ortiz Garcia v. Toledo Fernandez*, 405 F.3d 21, 24 (1st Cir. 2005) (per curiam). The court cites no other decision that has adopted different definitions of the term "similarly situated" for the purpose of setting different thresholds at different stages of a discrimination case, and I have not found any precedent (other than *Wheeler*) for the approach endorsed by the court today.

Third, the standard of "similarly situated in all relevant respects" also furthers the purposes of the prima facie case in the burden-shifting model of *McDonnell Douglas*. While the burden of establishing a prima facie case is not "onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the proof of a prima facie case has important legal consequences. It establishes a legal presumption that the employer unlawfully discriminated against the employee, because the alleged acts, "if otherwise unexplained, are more likely than not based on impermissible factors." *Id.* at 254 (internal quotation omitted). If the employer remains silent in the face of a prima facie case that is proved by a preponderance of the evidence, then the employee is entitled to judgment as a matter of law. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 n.3 (1993).

-21-

Under that framework, it makes good sense to consider whether an employee who seeks to make a prima facie case of disparate treatment by comparisons with another employee of a different race has demonstrated that the comparators are similarly situated in all *relevant* respects. For if they are not – that is, if the employees offered for comparison are *dis*similar in respects that are *relevant* to the disputed employment action – then it is likely that the relevant dissimilarities explain the disparate treatment. In that case, the evidence has not "eliminate[d] the most common nondiscriminatory reasons" for the employer's action, and it does not justify the legal presumption that the employer's acts "are more likely than not based on impermissible factors." *Burdine*, 450 U.S. at 254 (internal quotation omitted).

This is not to say that employees offered for comparison must be similarly situated in *all* respects. If the evidence supports an inference that a particular dissimilarity is not relevant to the disputed act of the employer, then the presence of that dissimilarity will not preclude the employee from establishing a prima facie case. *See Ercegovich*, 154 F.3d at 353. But it is difficult to see why there is anything unduly rigorous about requiring a plaintiff to show that a jury could find that the employees offered for comparison are similarly situated in those respects that are *relevant* to the dispute, before there arises a legal presumption that the employer acted based on an unlawful discriminatory motive.[9]

_____

[9]Of course, a discharged employee need not rely on comparisons with similarly situated employees to prove unlawful discrimination. For example, to make a prima facie case under the *McDonnell Douglas* framework, the employee may produce evidence that her position remained open after the discharge and ultimately was filled by a person of a different race. *See Hicks*, 509 U.S. at 506. Or an employee could attempt to prove race discrimination through direct evidence in the form of actions or remarks by the employer that reflect discriminatory intent. *See Williams*, 14 F.3d at 1310 n.4. Rodgers, however, argues only that a comparison of her termination with the employer's treatment of another employee establishes a prima facie case and intentional race discrimination.

For essentially the reasons discussed by the court in Part II.C.1 of its opinion, I agree with the district court that Rodgers did not establish a prima facie case of unlawful discrimination. Accepting for the sake of argument the court's view that she did make a prima facie case, I agree that Rodgers did not raise a genuine issue of material fact as to whether U.S. Bank's stated reasons for her termination were a pretext for discrimination. Therefore, I concur in the judgment.

_____