**NOT RECOMMENDED FOR PUBLICATION**
File Name: 06a0135n.06
Filed: February 17, 2006

No. 05-3018

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**TINAH D. MISCHER,**

    *Plaintiff-Appellant,*

                           On Appeal from the United States

**v.**                           District Court for the Northern District

                           of Ohio

**ERIE METRO HOUSING**
**AUTHORITY, et. al.,**

    *Defendants-Appellees.*

**BEFORE: GUY and GIBBONS, Circuit Judges; and EDMUNDS, District Judge.**[*]

    **PER CURIAM**. On April 1, 2002, Plaintiff-Appellant Tinah Mischer was hired as Executive Director of Defendant-Appellee Erie Metropolitan Housing Authority ("EMHA"). Two months later, she was terminated. Mischer brought this suit against EMHA and Edward Feick on grounds of race and sex discrimination under Title VII of the Civil Rights Act, 42, U.S.C. § 2000(e) *et seq*., and wrongful termination in violation of public policy under Ohio law.[1] In September of

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]Plaintiff originally sued in the Erie County Court of Common Pleas, asserting eleven causes of action against EMHA and several individual defendants. After the case was removed to federal district court, several of the claims and individual defendants were dismissed by the court and by Mischer. In the district court's grant of summary judgment, the court addressed the discrimination claims, the wrongful termination claims, and promissory estoppel claims against EMHA and Feick. Plaintiff does not raise promissory estoppel arguments in her appeal.

2004, the district court granted Defendants' motion for summary judgment. Mischer now appeals. For the following reasons, we **AFFIRM** the district court's grant of summary judgment.

**I.**

EMHA is a local housing agency in Sandusky, Ohio. It is a political subdivision of the State of Ohio and is also regulated by the Department of Housing and Urban Development. EMHA's Board of Commissioners, which includes Defendant Edward Feick, is responsible for hiring the agency's Executive Director. In August of 2000, EMHA was considering candidates for that position. The previous Executive Director, Barbara Johnson, is an African-American female who had held the position for about twenty years.

One candidate to replace Johnson was Russell Conway, a white male. While considering Conway for the position, the Board of Commissioners held a meeeting in which they invited EMHA employees to express their concerns about his leadership. (It appears that Conway already had Executive Director responsibilities, as an interim director or on probationary status.) Notwithstanding the concerns, if any, which were expressed during the meeting, Conway was subsequently selected for the position of Executive Director.

Conway may have had additional or continuing problems while he was Executive Director as well, although the nature and extent of those problems is not clear. Commissioner Edward Feick was asked, "While Russell Conway was Executive Director, do you recall having any issues with his job performance?" Feick responded, "I don't remember the issues, but we did, yes." According to the Ohio Civil Rights Commission, Conway explained that "he does not recall any performance problems other than he and the Board had a disagreement as to exactly what his authority was as

Executive Director."[2] Otherwise, there is no evidence that Conway was difficult to work with, or that he presented the Board of Commissioners with any work-related problems.

Plaintiff Tinah Mischer, an African-American female, began her career at EMHA in May of 2001, when she was hired as its Family Self-Sufficiency Coordinator. Mischer's career progressed quickly. When her direct supervisor was fired late in 2001, Mischer was promoted to his position as Head of Section Eight Housing. Then, sometime in early 2002, Executive Director Conway approached Mischer and told her that he planned to resign. He encouraged Mischer to express interest in his position and even recommended her to the Board.

In April of 2002, Mischer took over as Executive Director of EMHA. A three-year employment contract was proposed but was never executed. Mischer concedes that she was a probationary at-will employee, who could be fired for any reason or no reason at all, so long as her termination was otherwise legal.

Mischer asserts that she was given the task of cleaning up "30 years of issues" at EMHA. As she understood, this could require confronting many of the people and structures then in place. Almost immediately after starting her new job, however, her confrontational style began to create friction.

Mischer quickly transferred Nel Thomas, a veteran Executive Secretary at EMHA, to the Public Housing Department. Thomas had been leaving work up to three or four times per day to care for her ill husband. Although these absences had been permitted pursuant to the Family and

---

[2]The Ohio Civil Rights Commission conducted a separate investigation into Mischer's claims of discrimination. It found that it was "not probable" that EMHA violated Ohio civil rights law in its treatment of Tinah Mischer.

Medical Leave Act, Mischer felt that they were affecting Thomas's ability to do her job, and wanted her moved out of the Executive Director's office. Upset about the transfer, Thomas brought her concerns to an executive session of the Board of Commissioners. EMHA Counsel Robert Moore warned Mischer, "Nel has 19 years here. The Board is going to take her side." In fact, the Board ultimately supported Mischer's decision—finding that personnel matters are the province of the Executive Director—but not without hesitation. One Commissioner, Patricia Fries, stated, "The way she treated Nel Thomas when we were all together, was not the way you treat an employee who has been there for 19 years. It's not the way you talk to them." At a meeting soon afterwards, Moore met with Mischer and "explained to her that the commissioners were concerned about her performance, both in the handling of the staff and also in her interaction with the clients of the Authority." Mischer agreed to consult with Moore before making any further personnel changes.

Mischer also had problems with another EMHA veteran, Director of Finance Cheryl Ward. On May 29, 2002, Ward presented to Mischer several EMHA escrow checks for Mischer's authorization. Ward had cut the checks without Mischer's prior approval and had then given them to Mischer along with the required documentation. She told Mischer that she would keep the checks in her desk until Mischer returned the documentation. The next day, Mischer wrote a sharp memorandum to Ward stating that Ward was not permitted to cut EMHA checks without prior approval. On June 3, Ward responded with her own memorandum. She explained that she had cut the checks first because she was concerned that Mischer might not otherwise be available to sign them on time. She also explained to Mischer—just as she apparently had several months earlier—that EMHA policy required only that checks not be *paid* without prior approval, but said nothing about whether checks could be *cut* ahead of time.

Around the same time, Mischer wrote another memorandum to Ward about a separate matter entirely:

> I noticed that you made the decision to grant Darrin Garrett and Nel Thomas (both on extended medical leave) vacation/sick time, and holiday pay without my knowledge or consent . . . . The personnel policy and procedures of EMHA does not validate or authorize you to make such decisions or for you to carry out such practices. This practice will stop immediately.

Ward responded again with a memorandum of her own, informing Mischer that EMHA policy had always been to pay these employees for vacation/sick and holiday time. She further stated,

> If you are going to change policies, all you have to do is simply tell us. Since we do not read minds, all we can do is as we had been told to do in the past. Again, let me state that I was never even consulted about this issue, so your assumption that I did something wrong was in error.

Mischer's shake-up did not go unnoticed by the Board of Commissioners. Commissioner Patricia Fries states that she "called Cheryl and asked her what in the world was going on . . . . [S]he told me that the staff was very upset with her treatment." Ward describes the same conversation: "She asked how things were going under Tinah, and I says, 'A mess.' You know, there's just been so many things . . . ."

These were not the only incidents in which employees expressed frustration about Mischer's management style. Section Eight Case Manager Linda Corrick, for example, took issue with a critical memorandum Mischer had written about her performance. After contesting each of Mischer's complaints, she stated, "I feel that this Memo is unnecessary and unwarranted." Another Section Eight Case Manager, Susan Gowdy, was less subtle after her exchange of several memoranda with Mischer:

> Again Ms. Mischer, your Memos are threatening to me in nature and they reek of harassment. I feel as if you are out to get even with me for something unknown to

me. Everyday [sic] that I come in to work I never know what's in store for me. Your mood dictates the type of day I'll have. Not only is that unfair, it's also unprofessional, unethical, inappropriate, and not conducive to the business at hand.

An EMHA maintenance employee went so far as to call Commissioner Fries at home to complain about unfair treatment and the threatened loss of his job.

Fries points out that this hostility stretched beyond EMHA itself, and into the community it served:

We've never had a tenant come and complain about the . . . Executive Director before, ever . . . . You know, we're a community service . . . . We're certainly customer based . . . We certainly have to treat [our tenants] with due respect in every way and I did not find that that was happening in several instances. [Mischer] had fights, at least one fight with one landlord, that I'm aware of. We need a person who is Executive Director representing the Authority, who presents a respectful and good image.

EMHA contends that Mischer's run-ins with EMHA staff represented a pattern: "Her preferred method of dealing with . . . EMHA employees was to fire off sharp and critical memoranda to the employee in question." As Fries puts it, "Her written notices to the staff were very poorly expressed." And Commissioner Edward Feick states that Mischer "proved unable to maintain a professional working relationship with her staff and the Board, and had cultivated a working environment full of acrimony with respect to employees and tenants." Indeed, Mischer has conceded that she sent a lot of critical memoranda, some of which were "very curt," and that she "had some type of confrontation with almost everyone who was a direct report to [her] in the short time [she was] Executive Director."

Mischer concerned the Board of Commissioners with her management decisions as well. She admits to changing EMHA policy on water payments, such that the agency would be responsible for paying tenants' bills. This move placed EMHA under a significant financial burden

and caused widespread confusion among residents. Nevertheless, Mischer made the decision unilaterally, without the advice of counsel or the consent of the Board of Commissioners. She also failed to grasp the Housing and Urban Development line of credit system and grant funding of some EMHA operations, both of which placed EMHA in even greater financial jeopardy.

Two months after beginning her job, Mischer was terminated. After a vote of the Board of Commissioners, Commissioner Feick and Board Counsel Robert Moore informed Mischer in person that she was not compatible with the EMHA's Board or Staff.[3] Mischer was replaced by Ralph Chamberlain, a white male.

## II.

We review a district court's grant of summary judgment *de novo*. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). We must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Id.* Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not appropriate, however, if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those which "might affect the outcome of the suit." *Id.*

## III.

---

[3]This is also explained in a letter from Moore to Mischer, dated June 5, 2002. While Mischer contends that she never received the letter, she concedes that the letter's explanation for her termination is consistent with what Moore and Feick told her in person.

**A.**

In an employment discrimination case in which the plaintiff can point to no direct evidence of discrimination, a three-step framework guides our analysis. This familiar test, described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies to cases in which a plaintiff alleges discriminatory termination in violation of Title VII. *Logan v. Dennys, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001).

Initially, the plaintiff has the burden of establishing four elements of a prima facie case of discrimination: 1) membership in a protected class; 2) qualification for the position; 3) discharge from employment; and 4) replacement by a person outside of the protected class. *Id*. *See also McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254.

Upon the plaintiff's establishment of a prima facie case, the burden shifts to the defendant to "produc[e] evidence that the complained-of adverse action was taken against the employee for a legitimate, nondiscriminatory reason. Although the defendant is not required to convince the court that proffered reasons actually motivated its actions, it 'must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [discharge].'" *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting *Burdine*, 450 U.S. at 254-55). The defendant's burden "is one of production, not of persuasion." *Id.*

"If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 (footnote omitted). The plaintiff must be given a "full and fair opportunity to demonstrate pretext . . . . She may succeed in this either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256.

As the district court found, and as EMHA concedes, Mischer has made a prima facie showing of discriminatory discharge under the *McDonnell Douglas/Burdine* formula. She is an African-American woman. She was terminated from her position as EMHA's Executive Director. She was, ostensibly, qualified for that position (she had been hired). And she was replaced by a white man.

In response to Mischer's prima facie showing, EMHA claims not only that Mischer was unable to work effectively with her subordinates or with the Board of Commissioners, but that her poor decisions and lack of oversight placed the organization in substantial financial jeopardy. EMHA has presented voluminous evidence to support this contention.

This Court has held that "once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (analyzing age discrimination claim). Thus, the burden has returned to Mischer to prove discrimination "to a new level of specificity." *Burdine*, 450 U.S. at 255.

There are three ways in which Mischer may meet her burden, which this Court discussed in *Manzer*:

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993) (emphasis added and quotation marks omitted). The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never

happened . . . . The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff . . . .

The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

29 F.3d at 1084.

As to the first of these, Mischer has not shown that EMHA's proffered reasons have no basis in fact. Indeed, she admits that her aggressiveness was a reason for her termination and that she had a confrontation with nearly everybody in her direct chain of authority. She further admits that she unilaterally changed EMHA policy concerning payment of water bills, and that she did not understand several aspects of EMHA's finances. Given these admissions and the clear record, Mischer cannot now reasonably argue that EMHA's justification for firing her has no basis in fact. In other words, she cannot show that "the proffered bases for [her] discharge never happened." *Id.*

As to the third showing, Mischer relies on the contention that her predecessor, Russell Conway, had "significant personnel problems and was not terminated." She goes so far as to claim that it is "beyond dispute" that she and Conway "had the same problems." She has virtually no evidence to support this contention, however. Although a meeting was apparently held in August, 2000, at which employees were encouraged to air their concerns about Conway, EMHA *subsequently* hired him as its Executive Director. And while Commissioner Feick recalled having

some job performance issues with Conway, he could not remember what those issues might have been. Finally, Conway himself stated to investigators for the Ohio Civil Rights Commission that his only problem was a disagreement over the Executive Director's authority. This does not rise to the level of "substantially identical conduct" as required by *Manzer*. 29 F.3d at 1084.

Mischer finally argues that EMHA's proffered reasons did not actually motivate her discharge. Under *Manzer*, she must demonstrate "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* The circumstantial evidence does not support such a conclusion.

EMHA contends that it terminated Mischer because of "her utter inability to do her job and inability to work compatibly or professionally with others." Mischer attempts to show pretext by arguing that EMHA's stated reasons are "insufficient to justify their actions." In essence, she concedes that the cited incidents took place, but argues that her conduct did not warrant termination.

For example, Mischer argues that her transfer of veteran employee Nel Thomas, who had been leaving work regularly to care for her sick husband, was entirely legal under the Family and Medical Leave Act, 29 U.S.C. § 2612(b)(2). But this argument misses the point. Whether or not the transfer was *legal*, it created great friction between Mischer, the staff, and the Board of EMHA. And while the Board ultimately deferred to Mischer's judgment, substantial evidence shows that the Commissioners and EMHA's Counsel were concerned that she had mistreated Thomas.

Mischer makes similar arguments about her heated disputes with Cheryl Ward. She now argues that she was right and Ward was wrong about these EMHA financial policies. Again, however, this argument misses the point. Whether or not Mischer correctly understood EMHA policy, she could not get along with her staff. The same is true of Mischer's memoranda to Linda

Corrick and Susan Gowdy. Whether or not her complaints against these employees were well-founded, her memoranda engendered significant hostility at EMHA, a fact which obviously did not escape the attention of the Board of Commissioners.

In sum, Mischer now argues that under the circumstances of each of these instances, she had good reason for her confrontational approach. But as the district court correctly found, "she has not raised a genuine dispute about the principal reason given for her termination: that she simply could not work amicably with other people." In other words, Mischer was fired for her confrontational, aggressive manner, rather than her stances on the particular issues in dispute. Not only has she failed to rebut this assertion, she has conceded it.

The surrounding circumstantial evidence is no more helpful to Mischer. For example, prior to Mischer and Conway, EMHA's Executive Director was Barbara Johnson, an African-American female. Johnson successfully ran the agency for twenty years before her retirement. Johnson would not likely have enjoyed such a tenure at an organization intent on discriminating against African-American females.

Furthermore, the Board that fired Mischer, which is made up of five members, includes both women and men, and two African-Americans. Those participating in the executive session of the Board in June of 2002, including an African-American female, Dana Gramblin, voted unanimously to terminate Mischer.

Even more compelling is the fact that Mischer was hired and fired by the same Board of Directors within a span of only two months. The same-actor inference, adopted by this Court in *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461, 464 (6th Cir. 1995), allows us "to infer a lack of discrimination from the fact that the same individual both hired and fired the employee."

*Id.* at 463.[4] EMHA's Board of Commissioners consists of five members. Mischer states that she interviewed with "the Board itself," but that Theodore Huston was not present. About two weeks later, the Board voted to hire Mischer. It is unclear how many Commissioners were present at that meeting,[5] or how many voted in favor of hiring Mischer.[6] At the executive session in which the Board voted to terminate Mischer, Commissioner Theodore Huston abstained from voting because he had been ill and was unfamiliar with her tenure at EMHA. The four remaining commissioners voted unanimously to fire Mischer. Thus, the same Board that hired Mischer in March turned around and terminated her in June. Such conduct is inconsistent with any racial or gender animus against her. *See*, *e.g.*, *Wofford v. Middletown Tube Works, Inc.*, 67 Fed. Appx. 312, 318 (6th Cir.

[4]In *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003) (*en banc*), this Court considered the weight appropriately to be given to the inference. Recognizing a split of authority, the Court sided with those circuits who "have minimized the importance of the same-actor inference, emphasizing that although a court may infer an absence of discrimination where the same individual hired and fired the plaintiff, such an inference is not required." *Id.* at 573. Thus, the Court held that the inference is not mandatory, and indeed "it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id.* at 573-74.

Despite *Wexler*'s weakening of the same-actor inference, this is the type of case in which it remains appropriate. Because Mischer has presented no direct evidence of discrimination, we are left to rely entirely on circumstantial evidence to resolve the question whether EMHA's proffered reasons for terminating her might arguably be pretextual. The same-actor inference is helpful here.

[5]Mischer contends that Commissioner Feick was not at the meeting when the Board decided to hire her. Robert Moore states that Feick "was away on vacation, I believe he was gone almost the entire month of March." Nevertheless, Feick himself implies that the entire Board took part in the vote to hire Mischer: "I was a member of the Board that voted to hire Tinah Mischer as Executive Director of EMHA in March 2002. At that time, the Board was made up of myself, Patricia Fries, Dana Gamblin, Theodore Huston, and Suanna Brown."

[6]Mischer now contends that "Mrs. Fries was not in favor of hiring Mischer as Executive Director . . . ." While there is no evidence that Fries actually *voted* against Mischer, when she was asked whether she had favored hiring Mischer, Fries responded, "I was not in favor of hiring anyone at that point. I—my position with the Board was I wanted to wait at least several months . . . . I was not in favor of hiring someone right away, anyone."

2003) (finding that if the defendants "had despised [the plaintiff] because of the color of his skin, it seems odd that they would have hired him in the first instance only to fire him a few short months later").

All of the above facts, when taken together, compel the conclusion that EMHA's stated reason for terminating her was not a pretext for unlawful discrimination. Mischer has failed to meet her burden to produce evidence permitting a contrary finding, and no reasonable jury could find in her favor on this issue.

**B.**

Under Ohio law, an exception to the employment-at-will doctrine holds that employment decisions cannot be upheld if they otherwise contravene clear public policy. *Painter v. Graley*, 639 N.E.2d 51, 55 (Ohio 1994). The elements of a public policy tort are as follows:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id*. at 57 n. 8 (quoting H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-399 (1989)) (emphasis in original).

Mischer contends that such a clear public policy is expressed in Ohio Revised Code § 3735.28, which states, "A metropolitan housing authority . . . may employ . . . a director . . . and

shall fix the term of office, qualifications, and compensation . . . ." The words "shall fix the term of office," Mischer argues, precluded EMHA from hiring her on an at-will basis. Thus, Mischer's argument takes a form uncommon to employment termination cases: She contends that EMHA violated Ohio law not when it *fired* her, but when it *hired* her. Mischer's argument falls short for a number of reasons.

First, as the district court correctly found, EMHA did in fact "fix the term of office" as required by Ohio law. It fixed Mischer's term as probationary, while reserving the decision whether to fix another term of three years. Thus, as Mischer fully understood, she was a probationary, at-will employee. This fact does not conflict with Section 3735.28, which requires only that the Board "fix the term" of employment, not that the employment be "fixed for a term of years." In short, there is no "clear public policy" against imposing probationary employment terms on directors of Ohio housing authorities. Thus, Mischer has failed to meet the clarity element.

Furthermore, the doctrine upon which Mischer relies is a *tort* doctrine addressing *adverse* employment decisions. *Painter*, 639 N.E.2d at 655 ("A discharged employee has a private cause of action *sounding in tort for wrongful discharge* where his or her discharge is in contravention of a 'sufficiently clear public policy'") (quoting *Greeley v. Miami Valley Maint. Contractors*, 551 N.E.2d 981, 986 (Ohio 1990)) (emphasis added). EMHA's decision to *hire* Mischer—even on an at-will basis—can hardly be characterized as an *adverse* employment decision. And its decision to *fire* her was in no way related to any public policy about fixed terms for directors (assuming that such a policy exists). Indeed, Mischer makes no argument and presents no evidence to the contrary. Thus, Mischer has also failed to meet the causation element of the *Painter* wrongful discharge test.

Mischer has similarly presented no evidence to show that EMHA lacked an overriding legitimate business justification for her termination. Rather, as fully discussed above, the EMHA has presented valid reasons for firing Mischer and has supported those reasons with substantial evidence. Mischer has conceded much of the evidence and has failed to show that EMHA's justifications were pretextual. Thus, Mischer has failed to meet the overriding justification element, and her wrongful discharge claim must fail.

## IV.

For the reasons discussed above, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants Erie Metropolitan Housing Authority and Edward Feick. Plaintiff Tinah Mischer has failed to present material facts that could lead a reasonable jury to find in her favor.