# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3270

_____

Sheila Rheineck,

        Appellant,

v.

Hutchinson Technology,
Incorporated,

        Appellee.

\* Appeal from the United States
\* District Court for the
\* District of Minnesota.

_____

Submitted: June 13, 2001

Filed: August 16, 2001

_____

Before WOLLMAN, Chief Judge, BOWMAN, and HAMILTON,[1] Circuit Judges.

_____

WOLLMAN, Chief Judge.

Sheila Rheineck appeals from the district court's[2] grant of summary judgment in favor of her former employer Hutchinson Technology, Inc. (Hutchinson), a

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the Fourth Circuit, sitting by designation.

[2]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

manufacturer of computer disk drive components, on her sexual harassment claims. We affirm.

## I.

We recite the facts in the light most favorable to Rheineck. Rheineck served as a manufacturing supervisor at Hutchinson's Eau Claire, Wisconsin, manufacturing facility. In March of 1998, Rheineck received a favorable work performance review, but shortly thereafter her manager, Carol Mitchell, received complaints that Rheineck was often absent from work and missing from her supervisory area.

On Sunday, May 31, 1998, another supervisor, Mark Buchli, confiscated a picture from one of Hutchinson's employees. The image consisted of a woman wearing a one-piece swimsuit who was holding the straps away from her body to expose her breasts. The woman bore a striking resemblance to Rheineck. There is no evidence that either Hutchinson or Rheineck was aware of this picture before May 31.

Buchli immediately met with other supervisors at the facility, and the group addressed the situation by requesting that the unit coordinators on the manufacturing floor investigate and check for pornographic materials, particularly a copy of a photograph. Such materials were to be brought to the supervisors and then destroyed. Buchli telephoned Mitchell, who was also his manager, and she concurred with the supervisors' plan. Buchli also telephoned Rheineck to inform her of the situation.

That same day, an employee brought to the supervisors another copy of the picture. Buchli destroyed it and slipped the original in an envelope under Mitchell's office door. The supervisors also spoke with another employee who reportedly had had the picture on his computer screen. When the next shift of workers arrived, Buchli alerted the incoming supervisors to the situation and asked that the investigation be continued.

The next day, June 1, 1998, Rheineck went to the facility, understandably concerned about the picture. Unable to locate Mitchell, she went to the human resources department and explained the situation to James Fry, the human resources manager.

Fry told Rheineck not to worry, that the situation would be fully investigated, and that a statement would be made to clear her name. Immediately thereafter, Fry held a meeting of the management team, and they developed a plan to address the situation. They began a more thorough investigation of the origin and circulation of the picture, instructing the supervisors to investigate and requiring that all discovered copies of the picture were to be given to human resources by 11:00 a.m. (although one manager erroneously instructed his unit that the deadline was 5 p.m.). Anyone caught in possession of the picture thereafter was to receive corrective action. Fry also ordered a scan of the facility's computer system to check for the picture, which was subsequently discovered on several employees' computers. Additionally, Fry discussed with the plant manager and others in human resources the possibility of a plant-wide announcement that Rheineck was not the woman in the picture. They determined that because most of the more than 1200 employees at the facility had apparently not seen or heard about the picture, such an announcement would simply generate curiosity about the incident, and, therefore, would be counterproductive as a remedial step.

In the next few days, Hutchinson identified nine employees who had circulated the picture or had copies of it. One employee admitted that he had discovered the picture on a disk in a machine that had come from another facility and that he had given the picture to another employee. Fry telephoned personnel at that other facility, who investigated and reported that because numerous employees would have had access to that machine, it would be essentially impossible to determine if the picture originated from that facility or from which employee. Neither Rheineck nor Hutchinson was aware of any further circulation of the picture after June 1.

All nine employees who were connected with the circulation or possession of the picture were required to take sexual harassment training. All received, in accordance with the degree of their involvement with the picture, various disciplinary measures that were more severe than those measures which would have been Hutchinson's usual corrective action. Additionally, the three employees who had primarily started the distribution apologized in person to Rheineck on Friday, June 5, 1998. Rheineck testified that none of the nine committed any behavior that she felt was harassing after June 5.

Rheineck remained uncomfortable at the facility, however, because she felt that there continued to be "gawking" and rumors about the picture, including a rumor that she was indeed the woman in the picture. Most of the statements made to Rheineck, however, were generally supportive of and expressed sympathy for her, and she herself initiated approximately half of the conversations she had about the picture. Rheineck found several incidents to be offensive, however; for example, she was told that one employee at Hutchinson asserted that Rheineck was the woman in the picture. Also, employees in another department were heard discussing the picture, although the substance of the discussion was not reported. Non-employees of Hutchinson were also talking about the picture, which humiliated Rheineck. For example, statements about the picture were made to Rheineck's neighbor and her sister. Rheineck did not complain to Hutchinson specifically about the rumors, and Hutchinson took no remedial action to deal with such gossip.

In October of 1998, Mitchell met with Rheineck to discuss the need for improvement in Rheineck's work performance. Rheineck concedes that she was having trouble concentrating at work. Rheineck's performance, however, did not sufficiently improve, and in December of 1998, she was placed on a performance improvement plan, which included goals in areas such as commitment, time management, and professionalism. Rheineck's performance improved but was not at the level it had been in March of 1998. At her yearly performance review, in March

of 1999, these continuing problems were discussed, and Rheineck did not receive an expected raise.

Rheineck subsequently filed suit in district court, alleging numerous claims, including sexual harassment (hostile work environment) under Title VII, retaliation under Title VII, and breach of contract. On August 18, 2000, the district court granted summary judgment in favor of Hutchinson on all counts, concluding, among other things, that there was no genuine issue of material fact on whether Hutchinson's response to the picture was prompt remedial action reasonably calculated to end the harassment and on whether the subsequent rumors were sufficiently severe or pervasive to constitute a hostile work environment.

## II.

We review the district court's grant of summary judgment de novo. Henerey v. City of St. Charles, 200 F.3d 1128, 1131 (8th Cir. 1999). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

### A. Hostile Work Environment

Rheineck first contends that the district court erred in granting summary judgment in favor of Hutchinson on her claim of a hostile work environment. "Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964." Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1013 (8th Cir. 1988). A hostile work environment "arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Id. (quotation marks and citation omitted).

To succeed on a sexual harassment claim for a hostile work environment, a plaintiff must show that (1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. Id.; Stuart v. General Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000).

Rheineck's hostile work environment claims are based on two different time periods: (1) when the picture was in circulation and Hutchinson's employees were investigating, and (2) after remedial action had been taken but rumors continued to circulate at the facility.

First, with regard to the time period when the picture was first discovered, Rheineck must show that Hutchinson knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment. See Stuart, 217 F.3d at 633. Factors to be considered in assessing the reasonableness of Hutchinson's remedial measures include "the amount of time elapsed between the notice of harassment . . . and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment." Id.

It is undisputed that immediately after Buchli received and confiscated a copy of the picture, he called a meeting of supervisors, who instructed unit coordinators on the floor to investigate whether other employees possessed pornographic materials. An additional copy of the picture was destroyed that day. Buchli called his manager, who concurred with Buchli's actions, and Rheineck, and also informed arriving supervisors of the situation and how to respond. The following morning, human resources manager Fry held a meeting and began a more thorough investigation that included scanning the computer system, interviewing more employees, and contacting another facility to

-6-

discover the origin of the picture. Nine employees were disciplined for their involvement with the picture and required to take sexual harassment training, and three apologized in person to Rheineck within a week. Rheineck accepted the apologies and did not have further problems with any of the nine. Fry discussed a possible announcement about the picture with other facility managers, but they concluded that making one would only increase the interest in the picture.

We conclude that no reasonable juror could find Hutchinson's remedial actions to be anything but prompt and reasonably designed to end the harassment. Accordingly, Rheineck has failed to create a genuine issue of material fact on the propriety of Hutchinson's response. See id. (upholding summary judgment when employer started investigation no more than nine days after complaint, interviewed thirty people, immediately removed one computer with a pornographic program and checked others, reiterated its sexual harassment policy in a letter to all employees, and offered employee a transfer).

Second, concerning the time period after remedial action had been taken but when the picture was still a topic of conversation, we believe that it is unlikely that Hutchinson knew or should have known that rumors offensive to Rheineck continued to circulate about her. Assuming, however, that Rheineck created a genuine issue of material fact on that issue, we affirm the district court because Rheineck has failed to create a genuine issue of fact as to whether the harassment affected a term, condition, or privilege of employment.

To establish that the "harassment was so severe or pervasive as to alter a term, condition, or privilege of employment," Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 966 (8th Cir. 1999), Rheineck must show "that the workplace is permeated with discriminatory intimidation, ridicule, and insult," id. The conduct must be extreme to "ensure that Title VII does not become a 'general civility code.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). The totality of the circumstances

must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993). "Specifically, a court should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Scusa, 181 F.3d at 967 (quotation marks and citation omitted).

Rheineck alleges that rumors continued to circulate at the plant after Hutchinson's remedial action, but she also observed that many of the comments she heard were supportive and that she herself initiated some of the conversations about the matter. None of the handful of incidents that she cites involved derogatory or sexually suggestive comments made in her presence. The picture was no longer circulating, and Rheineck's claim of rampant rumors and gawking is unsupported in the record. Additionally, Rheineck presents no evidence that she felt physically threatened, and she continued to work full shifts. Several of the comments she cites were made by non-employees outside of work and thus add little support to her claims that her work environment itself was hostile. Although it is regrettable that Rheineck's workplace was exposed to this picture, we agree with the district court that Rheineck failed to create a genuine issue of material fact on whether the continuing rumors constituted harassment that was "so intimidating, offensive, or hostile that it poisoned the work environment," creating an abusive situation. See id. (quotation marks and citation omitted); Clark Co. Sch. Dist. v. Breeden, 121 S. Ct. 1508, 1510 (2001).

## B. Retaliation

Rheineck next argues that the district court erred in granting summary judgment in favor of Hutchinson on her claim that Hutchinson improperly placed her on a performance improvement plan and denied her a raise in retaliation for her complaints to management about the picture. To establish a prima facie case of retaliation, a

plaintiff must show that she engaged in statutorily protected activity, that the defendant took adverse action against her, and a connection between the two. Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997). The defendant may then rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action. Id. If the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal discrimination. Id.

In this case, the district court passed the question whether Rheineck had made a prima facie case and concluded that Hutchinson had presented evidence showing a legitimate reason for the performance plan and denial of a raise. The court then observed that Rheineck had pointed to no evidence to show that Hutchinson's proffered reason for denying her a raise was pretextual. We agree.

Rheineck does not dispute that her performance deteriorated. She argues instead that the deficiency resulted because of the sexual harassment and that she thus has made out a retaliation claim. Her performance, however, had been questioned before the incident with the picture. Moreover, Rheineck's evidence is misdirected: she must show not that the harassment caused her harm, but that Hutchinson's proffered reason for placing her on the performance plan and denying her a raise was pretextual. Rheineck has presented no evidence of pretext and thus has not raised "a genuine issue of fact on the question of pretext." Id. at 360; Berg v. Bruce, 112 F.3d 322, 328 (8th Cir. 1997) (summary judgment appropriate where plaintiff offered no proof to undermine the overwhelming evidence offered by former employer that led to termination for insubordination and professional misconduct).

## C. Contract

We agree with the district court that Rheineck's claim for breach of contract fails for lack of consideration. See Pincus v. Pabst Brewing Co., 893 F.2d 1544, 1549 (7th Cir. 1990). Her claim of promissory estoppel was not raised to the district court, and

we decline to address it in the first instance on appeal.  <u>See</u> <u>Bankcard Sys., Inc. v.</u> <u>Miller/Overfelt, Inc.</u>, 219 F.3d 770, 772 n.3 (8th Cir. 2000).

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.