# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2513

_____

Linda Green,                                    *
                                                *
    Plaintiff-Appellant,                        *
                                                *  Appeal from the United States
    v.                                          *  District Court for the District of
                                                *  Minnesota.
Franklin National Bank of Minneapolis,          *
doing business as Franklin Bank,                *
                                                *
    Defendant-Appellee.                         *

_____

Submitted: November 17, 2005
Filed: August 23, 2006

_____

Before WOLLMAN, LAY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Linda Green appeals the grant of summary judgment against her claims of a racially hostile work environment, discriminatory discharge, and retaliation under Title VII and 42 U.S.C. § 1981. Green also appeals the grant of summary judgment against her claim under the Minnesota Whistleblower Act, Minn. Stat. § 181.932, for her reporting of discrimination at Franklin National Bank. We affirm.

## I. Background

Green is an African-American female who was employed by Franklin National Bank. She worked as a teller from March 2002 until her termination on August 26, 2002. Because we are hearing this case as the result of a grant of summary judgment, we view the facts in the light most favorable to Green. The factual background of Green's claims is complicated. As a result, we first detail the allegations she made as to her work environment. Then, we turn to the specifics of her complaints to the employer and the bank's responses to those complaints. Next, we discuss the facts surrounding Green's termination. Lastly, we describe other evidence related to Green's claim.

## A. Work Environment

Green started working for Franklin National Bank at its Blaisdell Avenue location in Minneapolis, Minnesota, and remained there for about one month. She was transferred to the Washington Avenue location after complaining that a teller at the Blaisdell branch called her "stupid."

Beginning in May 2002, Green worked with Jared Howard, a teller at the Washington Avenue location. Howard is a Caucasian male. According to Green's deposition, Howard began harassing her and using racial slurs to describe her. Specifically, Howard called Green "monkey," "black monkey," and "chimpanzee." In June, Howard told Green that she should wear dreadlocks. The racially insensitive conduct continued until August 5, 2002.

Green asked Howard to stop using racial slurs, but he persisted and engaged in other demeaning conduct toward her. Green told Howard that she felt that the primate rhetoric was similar to saying "nigger," and that the phrase "porch monkeys" was historically used to discriminate against African-Americans. On several occasions,

-2-

Green made written notes of the dates of these incidents and her requests for Howard to stop. Those specific instances are detailed below, along with other related issues raised by Green.

During June 2002, Green alleges that Beth Markoe, Franklin National Bank's Vice President of Operations, and Tammy Koop, a bank officer, acted unprofessionally toward Green. Specifically, Green alleges that Markoe and Koop were blaming many of Howard's mistakes on Green. Further, Green believes that Markoe and Koop were unprofessional in their communications with her.

On July 10, 2002, Green felt she was treated rudely by Kyle Kray,[1] a commercial loan officer. Kray needed a cashier's check printed immediately and was rude to Green when she said she would get to it as soon as possible. According to Green, Kray was friendly toward Howard, but aggressive and demanding with Green.

On July 30, 2002, Howard told Green, "I want to eat your liver" and asked if he could "eat [her] liver." Howard told Green that he had eaten liver before, but found that it tasted sour. He then described the movie *Silence of the Lambs*[2] to Green. On other occasions, Howard made other intimidating remarks to Green. He told her that he "gets even" with people.

---

[1] The parties spell "Kyle Kray" differently. The appellee spells the name as "Kyle Kray" and the appellant spells the name as "Kyle Cray." The district court spelled the name with a "K." Since there is nothing definitive in the record as to the proper spelling, we have decided to use the "K" spelling of the name to be consistent.

[2] While the record does not explain exactly how Howard described the movie to Green, the underlying theme of the movie is consistent with the comments about devouring Green's liver. The movie is about a cannibalistic serial killer, Hannibal Lecter, who liked to eat his victims. During the movie, he said, "[a] census taker once tried to test me. I ate his liver with some fava beans and a nice chianti." Internet Movie Database, at http://imdb.com/title/tt0102926/quotes.

On August 5, 2002, while Howard and Green were closing the vault late in the afternoon, Howard again called Green a "monkey" and "chimpanzee." On August 7, 2002, Howard sent an email to Green that said "Just wanted to let you know . . . You got a funny shaped head." Green felt that the comment about her head was race related.

B. Green's Complaints and Franklin National Bank's Responses

At dates that are not specified in the record, Green reported Howard's racial harassment to Kim Reep, her supervisor. Reep is a woman of African-American and Caucasian heritage. Reep told Green that Reep could not do anything for Green and that Green should report the wrongful conduct to Wayne Erdman, a vice president of Franklin National Bank. Green did not make any complaints about Howard's racial comments during the months of May and June.

However, when Reep was on vacation in June 2002, Green made non-race-related complaints about her work environment to the President and CEO of Franklin National Bank, Dorothy Bridges. The substance of these complaints concerned the criticism from Markoe and Koop, and not the harassment by Howard. Bridges told Green that the two of them would talk with Reep concerning Green's complaints about Markoe and Koop. No followup meeting between Bridges, Green, and Reep took place.

On June 24, 2002, after Reep returned from vacation, Green spoke with her about Green's conflicts with Markoe. Green felt that Markoe was treating her differently than Howard. Reep met with Markoe and Green to discuss the conflict between them. According to Reep, Green attempted to explain her concerns to Markoe, but Markoe did not listen.

On July 10, 2002, Green reported the incident with Kray to Reep. Reep spoke with Erdman several times about Kray, but Erdman never told Reep whether he had spoken with Kray.

Also on July 10, 2002, Green complained about Howard's racial harassment to Erdmam. She told Erdman that Howard had called her "monkey." Erdman said he would speak to Howard about it.[3] However, according to Green, Erdman never spoke with Howard about Green's complaint.

On July 31, 2002, Markoe held a meeting with Green and Reep to discuss concerns about Green's work performance. The meeting did not mention any of Green's complaints about her work environment. Markoe cited several incidents where she had requested Green to do things for her, but Green did not do them immediately.

According to Markoe, Reep spoke with Howard about the racial slurs for the first time on August 1, 2002. This was Howard's first warning from a supervisor about racially insensitive conduct. Reep also spoke with Vice President Erdman. At that time, Erdman said he had already spoken with Green about the complaints. He did not indicate to Reep what was being done to resolve the problems.

On August 6, 2002, the day after the incident at the vault when Howard told Green she was a "chimpanzee" and a "monkey," Green told Reep about what Howard had said. Green also left a voicemail with Bridges about Howard's statements. Green told Reep that Green needed to speak with Bridges, but Reep said that Bridges would not want to hear from her. Reep proposed that Green and Reep try to work out the situation. Green ignored Reep's warnings and went to speak with Bridges. She put

[3] Erdman denies that Green told him about any of the racially insensitive language during this meeting. However, for purposes of reviewing a motion for summary judgment, we view the facts in the light most favorable to Green.

her complaints about Howard's August 5 comments in writing. Bridges told Green to take the written complaint to her supervisor and make a formal complaint. Reep gave Howard a second warning about racially insensitive language.

According to Bridges, the company's policy on sexual harassment also applied to racial harassment. The policy required that after an employee notified his or her direct supervisor of harassment, a supervisor would investigate the complaint. The supervisor was also responsible for attempting to resolve the complaint. There was no requirement to report harassment to the president of the bank. Franklin National Bank's policy required that the investigation proceed from the perspective of a reasonable victim of harassment and not the viewpoint of an alleged harasser. Upon beginning her employment, Green signed a form acknowledging that she understood Franklin National Bank's harassment policy. Bridges felt that it was not her duty to pursue the complaint. The proper course, in her view, was to wait for Green to make a formal complaint with Reep.

Green again met with Reep and gave her two written complaints detailing Howard's August 5 use of the word "monkey" and his July 30 statements about wanting to eat her liver. Reep told Howard about the complaint and told him that if something like that happened again, he would be fired.

When Green received the "funny shaped head" email, she forwarded it to Reep. Reep brought the email to Markoe and Erdman. After meeting, they decided to terminate Howard. Bridges was not part of the decision-making process to terminate Howard.

## C. Green's Termination

On August 21, 2002, Green spoke with Reep about taking classes the following week. These classes were for another job that Green wanted to do on her free weekends. The classes were scheduled on Monday, Tuesday, and Wednesday. Reep arranged for a teller from the Blaisdell location, Shelly, to cover for Green while she attended classes. According to Reep, Green's time missed was "all set" in terms of coverage. Reep told Erdman and another officer at the bank about the coverage. Erdman agreed to the coverage arrangement so that Green could attend classes. In his deposition, Erdman admitted that other employees were allowed to attend classes during work hours.

On August 23, 2002, Reep gave her two-week notice to Erdman. Erdman told her that he accepted the resignation to be effective immediately. The vault was audited before Reep was allowed to leave the bank. Reep stated that this made her feel like a criminal. Reep generally felt that she was treated unprofessionally when she offered her resignation. Green noted that Lynn Miller, a Caucasian employee, was not been treated the same when she gave her two-week notice.

Green worked at the bank on August 24. She attempted to confirm with Erdman that she had permission to take her classes the following week. Erdman told her to go to her class on Monday and call him during that day's break in her classes.

On August 26, Green went to her class and called Erdman during her break. He told her that she would be needed at the bank the next day, August 27. Green came to the bank later on August 26 and began work at 3:00 p.m. She worked two hours before she found time to talk with Erdman. Erdman again told Green that she was needed at work on August 27 and that she should not go to her class. Green told Erdman that she would be at work by noon and that Miller could cover for her. She told Erdman that she could not reschedule her class. Green told Erdman that Reep had

made coverage arrangements with a teller at the Blaisdell location. Erdman said he needed Green there and that the coverage arrangement was unacceptable. He also refused the suggestion that Miller cover for Green. Erdman offered to pay for the cost of Green's classes. However, Green informed Erdman that the classes were free.

It became apparent to Erdman that Green was upset by their conversation. Erdman told Green to turn off her computer and put her drawer away. He told her that he was letting her go.[4] Miller, Markoe, and Koop would cover Green's teller duties after she was gone.

Markoe prepared a series of memos related to Green's performance issues. Green alleges that these memos only surfaced after her firing and that she suspects they were prepared after the fact. The memos stated that Green was rude to customers, staff, and Markoe. The memos also detailed some problems Green was having with lock box processing. Green believes the memos were prepared at a later date because none of the issues therein were discussed in her August 7 meeting with Markoe. Reep also stated that she had never seen the memos before her deposition related to this case. Reep said that she was unaware of any of the underlying issues described in the Markoe memos. Reep further noted that the Markoe memos were unusual because it was generally Reep's job to evaluate the performance of tellers.

Franklin National Bank did have a regular performance review policy. Normally, an employee would receive a performance review and an individual improvement plan after ninety days with the bank. Reep stated that Green's performance was "okay" when Reep wrote the ninety-day performance review. There is neither a record of the performance review nor individual improvement plan. Neither document was given to Green during discovery. Franklin National Bank does

---

[4] Erdman denies this account of events, but as noted above, we view the facts in a light most favorable to Green.

not have an explanation for why the performance review and individual improvement plan are missing from Green's file.

## D. Other Related Facts

Green also describes other incidents at Franklin National Bank that she believes were racially motivated. She alleges that Erdman told her not to park her car in front of the bank and told her to move it. Erdman did not tell other workers, including Miller, a Caucasian customer service representative, to move their cars. Green asked Miller if Erdman had ever asked Miller to move her car, and Miller said she had not been told to do so. However, Erdman stated that he does remember telling Miller to move her car on some occasions.

Green also alleges that Markoe treated minorities at the bank differently from non-minorities. Green says that Markoe treated Lataya Pedigrew, an African-American bookkeeper, poorly. She says that Pedigrew was violently ill at work, but Markoe would not allow her to go home.

In addition, Markoe had several conflicts with Reep. Reep felt that Markoe was taking over her responsibilities to supervise the tellers. At some later date, Markoe was actually assigned to supervise Reep, but the intrusions into her work areas preceded that formal assignment. Markoe also told Reep that she would have expected Reep's son to have blue eyes like his father. When Reep told her that her son did in fact have brown eyes, Markoe asked, "does that mean she is full of shit like you?" Markoe made other comments about Reep's mixed race children. Reep told Green that Markoe said "so you have poo poo kids too."

## II. Standard of Review

We review an order of summary judgment de novo. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006 (8th Cir. 2005). In doing so, we view all evidence in a light most favorable to the non-moving party. Id. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III. Hostile Work Environment

The district court found that Green did not prove that the harassment at her workplace was severe and pervasive enough to be actionable. Green argues that the district court's reasoning is flawed because it failed to properly apply the totality of circumstances analysis outlined in Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

To establish a claim of hostile work environment, a plaintiff "must show (1) he [or she] belonged to a protected group; (2) he [or she] was subjected to unwelcome harassment; (3) the harassment was based upon race; (4) the harassment affected a term, condition, or privilege of his [or her] employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action." Ross v. Douglas County, 234 F.3d 391, 395-96 (8th Cir. 2000). The underlying wrongful conduct "must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998).

The district court granted summary judgment on the hostile work environment claim because the court found that (1) the harassment was not severe or pervasive enough to be actionable; and (2) the employer took legally sufficient remedial action. We disagree with the district court that the harassment was not severe or pervasive, but agree that the employer's response was adequate to grant summary judgment on the hostile work environment claim.

Green and the United States Equal Employment Opportunity Commission (EEOC)[5] argue that the alleged conduct at issue in this matter was so severe and pervasive that it affected a material condition of employment. "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII." Jackson v. Flint Ink. N. Am. Corp., 370 F.3d 791, 794 (8th Cir. 2004) (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)), *mod. on reh'g on other grounds*, 382 F.3d 869 (8th Cir. 2004). We also consider physical threats in conjunction with racial harassment in determining whether a hostile work environment exists. Harris, 510 U.S. at 23. However, if the comments are "[s]poradic or casual," they are unlikely to establish a hostile work environment claim. Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999). Frequency of harassment is a factor, but even infrequent conduct can be severe enough to be actionable. See Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 884-85 (8th Cir. 2002).

In the present matter, Green's allegations about Howard's statements to her are sufficient to be actionable. His comments were frequent and directed at Green. While Green did not make a handwritten notation of all the times Howard called Green a "monkey," she created a record of several instances.

---

[5] The EEOC submitted a separate brief in this case disagreeing with the district court's findings as to the severity and pervasiveness of the harassment and as to the retaliation claim.

Green had told Howard that she thought the term "monkey" was roughly equivalent to "Nigger." Other courts have agreed with Green's assessment of calling African-Americans "monkeys." White v. BFI Waste Servs. LLC, 375 F.3d 288, 298 (4th Cir. 2004). "To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the mere unflattering; it is degrading and humiliating in the extreme." Id. The use of the term "monkey" and other similar words have been part of actionable racial harassment claims across the country. See Jeffries v. Metro-Mark, Inc., 45 F.3d 258, 260 (8th Cir. 1995) (plaintiff was called a "monkey"); Webb v. Worldwide Flight Serv., Inc., 407 F.3d 1192, 1193 (11th Cir. 2005) (plaintiff was called a "monkey"); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 182 (4th Cir. 2001) (plaintiff was called "monkey" and "dumb monkey"); Daniels v. Pipefitters' Ass'n Local Union No. 597, 945 F.2d 906, 910 (7th Cir. 1991) (plaintiffs were called "porch monkeys" and "baboons"). Primate rhetoric has been used to intimidate African-Americans and monkey imagery has been significant in racial harassment in other contexts as well. Morgan v. McDonough, 540 F.2d 527, 531 (1st Cir. 1976) (in a school desegregation case, Caucasian students harassed African-American students by chanting "assassinate the nigger apes").

In all, there are eight alleged instances of Howard using racially insensitive terms toward Green in a three-month time frame. We have found just a few incidents in a longer time span to be sufficient for a hostile work environment claim. See Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 908-09 (8th Cir. 2003) (five incidents of harassment within seven months was actionable).

Howard's comments about wanting to eat Green's liver are also noteworthy. While the comments were not in themselves obviously racially motivated, they do constitute the sort of physical threats that are significant in cases like this one. Howard also told Green he liked to "get even" with people who wronged him. Howard facilitated an atmosphere of intimidation that accentuated the effect of his racial slurs directed at Green.

Taking all inferences in the light most favorable to Green, we find sufficient severity and pervasiveness of harassment for Green's claim to be actionable. Because we find Howard's comments alone were sufficient to form a hostile work environment, we do not discuss the other factual claims of harassment made by Green.

However, we affirm the grant of summary judgment on the hostile work environment claim because Green has failed to show that Franklin National Bank did not take the proper remedial action. Title VII does not necessarily require that an employer fire a harasser. Davis v. Tri-State Mack Distribs., Inc., 981 F.2d 340, 343 (8th Cir. 1992). Nonetheless, Franklin National Bank did fire Howard to end the harassment against Green.

Green made several informal complaints about her harassment in the time leading up to early August 2002. She also had meetings with the CEO of the bank and other supervisory employees where she complained about non-racial harassment at the bank. She alleges that she told Erdman on July 10 about the allegations of racial harassment. Assuming that claim is true, it still was less than one month later that Franklin National Bank terminated Howard. Further, as Green waited until early August to make a formal complaint, it is disingenuous for her to argue that the bank should have acted sooner to dismiss Howard.[6] The bank's employees may not have acted in ideal manner in this case, but the remedial actions of Franklin National Bank were sufficient.

The actions by Franklin National Bank promptly followed the formal complaint. The firing of the harasser in a hostile work environment case can effectively bar a plaintiff's claim. See Zirpel v. Toshiba Am. Info. Sys., 111 F.3d 80,

_____

[6] It is unclear from the record how many of the alleged incidents occurred after the alleged July 10 meeting. While Green did keep some written records of Howard's actions, she also reports incidents for which she did not make a record.

81 (8th Cir. 1997). Green argues that Franklin National Bank did not fire Howard promptly enough. However, the cases that Green cites to support her claim involved situations where the employer waited much longer than one month to terminate the employee. Therefore, we conclude that the grant of summary judgment on the hostile work environment claim as to Howard's harassment was proper because Franklin National Bank took prompt remedial action.

As to the other alleged harassment, it is not clear that Green ever reported it to anyone or that it was racially motivated. Green's conflict with Markoe does not have any of the traditional marks of racial harassment. It may have been unprofessional, but there is no link to racial animus. Similarly, there is nothing in the record to support that Green's problems with Kray were the result of racial differences. Further, the other allegations were never reported as part of the bank's internal procedures. We would be hard pressed to hold the bank could be liable for conduct that was never reported.

## IV. Discriminatory Discharge

Green argues that she was terminated because of her race. To prove a claim of discriminatory discharge, Green must show: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is evidence that gives rise to an inference of discrimination. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005).

The district court and both parties agree that Green has met her burden as to the first three elements of a discriminatory discharge claim. However, the district court found that Green did not show any evidence that gives rise to an inference of discrimination. We agree.

-14-

We have held that for an employee to prove a discriminatory discharge claim, he or she must show that similarly situated employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." Id. at 851 (quoting Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004)). Green argues that the district court did not properly apply the Rodgers test. However, we find no error in the district court's analysis on this point.

Green argues that she was replaced in her duties by Miller, a Caucasian female. She further alleges that she was denied the same parking privileges as Miller. Also, Green argues that the conduct of Kray and Markoe was racially motivated because they were both friendlier with Howard.

As to Miller replacing Green, there is no evidence to support this claim. It is Green's burden to "present[] evidence sufficiently supporting disputed material facts that a reasonable jury could return a verdict in [his or her] favor." Jackson v. Arkansas Dep't of Educ., 272 F.3d 1020, 1025 (8th Cir. 2001) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992). Green has offered no evidence to prove that Miller replaced her. While Miller, along with other bank employees, did replace Green on an ad hoc basis, there is no evidence that she was the permanent replacement for Green's position. As a result, Green has not met her minimal prima facie burden on this point.

As to Green's other allegations regarding differential treatment, she has not connected them in any way to her discharge. A plaintiff must show some causal link between the differential treatment and her adverse employment action. In this case, none of the employees who allegedly treated Green differently had any role in her firing.[7] Without that connection, the claims of differential treatment cannot support

---

[7] While Markoe did prepare memoranda that gave poor performance reviews to Green, these were not linked to her firing. In fact, the argument Green makes about the Markoe memos, which we discuss in regard to the retaliation claim, is that the

-15-

an inference of discriminatory intent. See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1157 (8th Cir. 1999).

Because Green has not established a prima facie case for discriminatory discharge, we need not discuss pretextual motives for this claim. Instead, we address the issue of pretext below, in the discussion of retaliatory discharge.

V. Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee for engaging in protected action such as making a racial harassment complaint. 42 U.S.C. § 2000e-3(a). "To prove a retaliation claim, a plaintiff must show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 739 (8th Cir. 2005) (citing Rheineck v. Hutchinson Tech., Inc., 261 F.3d 751, 757 (8th Cir. 2001)).[8] A plaintiff "need not establish the conduct which [he or] she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying conduct violated the law." Foster v. Time Warner Entm't Co., 250 F.3d 1189, 1195 (8th Cir. 2001) (internal citations omitted).

memos were not prepared until after Green's termination. As a result, the reports from Markoe, as described by Green's allegations, were not connected to Green's discharge.

[8] The elements of a Title VII retaliation claim are the same as those defined under the Minnesota Whistleblower Act, Minn. Stat. § 181.932. As a result, our discussion here applies to the whistleblowing claim as well. Green's argument that the two should be addressed separately is unpersuasive. In the cases Green cites, the conduct the whistleblowers were reporting was separate from the discriminatory conduct. In this case, however, the conduct is the same.

-16-

The defense can rebut a retaliation claim by showing a "non retaliatory reason for the adverse employment action." Rheineck, 261 F.3d at 757. "If the defendant can show a legitimate reason, the plaintiff must show that the given reason was only a pretext for discrimination." Gilooly, 421 F.3d at 739.

In the present matter, the district court concluded that Green failed to establish a prima facie retaliation claim. Specifically, the district court found that Green did not engage in protected activity and that Green did not show a causal connection between her termination and a retaliatory motive. We disagree that Green had not engaged in protected activity, but nonetheless affirm the judgment of the district court concerning the retaliation claim.

Green told her immediate supervisor, Reep, about Howard's alleged racial harassment. She also alleges that she later told Erdman about instances of racial harassment. In August, she told the CEO of the bank, Bridges, about the instances of racial harassment. After the meeting with the CEO, she filed a formal complaint detailing the racial harassment she experienced from Howard. These reporting activities are the very essence of protected activity under Title VII.

The district court seemingly introduces a second requirement on Green: that she "oppose Franklin National Bank's alleged failure to respond to her complaints." However, this burden is not based upon existing statutory authority or case law. A plaintiff need only report the alleged wrongful activity. There is no additional requirement that the plaintiff report the perceived failure of the company to take proper remedial action.

The district court relies on Pope v. ESA Services., Inc., 406 F.3d 1001 (8th Cir. 2005) as the basis for its findings on this issue. We believe that reliance is mistaken. In Pope, the plaintiff failed to make explicit complaints about discriminatory treatment. Id. at 1010. Unlike the present matter, the plaintiff in Pope had simply

observed that there were no African-American employees in management. That is very different than the conduct of Green who alleges that she actively complained about racially hostile comments made toward her.

The district court also concluded that Green failed to establish a causal connection between her firing and the protected activity. This is a much closer issue than the protected activity prong.

The district court found that the period of three weeks between the protected activity and the firing was "without more, insufficient to establish an inference of causation." The district court did not find any other evidence to create the inference that there was a causal connection.

Our cases concerning the role of timing in a retaliation claim create a complicated picture. Generally, "the threshold of proof necessary to establish a prima facie case is minimal." Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1022 (8th Cir. 1998). The timing of an adverse employment action in connection with the protected activity "can sometimes establish causation for purpose of establishing a prima facie case." Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000). We have held that periods much longer than the three weeks in the present matter can be used to infer causation. See Smith v. St. Louis Univ., 109 F.3d 1261, 1266 (8th Cir. 1997) (inference of a causal connection was found when there was a six month gap between the adverse action and the protected activity); O'Bryan v. KTIV Television, 64 F.3d 1188, 1193 (8th Cir. 1995). "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005) (citing Smith v. Riceland Foods, Inc., 151 F.3d 813, 819-20 (8th Cir. 1998). In Peterson, a two-week gap between termination and protected activity was "close enough to establish causation in a prima facie case." Id. at 525.

-18-

Nonetheless, we have also held that termination shortly after protected activity is not enough, standing alone, to raise a genuine issue of material fact as to the causal connection prong of a prima facie claim. See, e.g., EEOC v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003) (a firing one month after engaging in the protected activity was insufficient, by itself, to support a jury's verdict on retaliation in favor of the plaintiff). However, in Kohler, the case was on appeal after a jury verdict. We specifically noted that it "was improper" to apply the reasoning in Kohler to evaluating a prima facie claim "because the case had been tried on the merits." Kohler, 335 F.3d at 774 n.7. As a result, Kohler is distinguishable from the present matter as to the question of establishing a prima facie claim.

We have also held that "[g]enerally, more than a temporal connection between the protected conduct and adverse employment action is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). In Kiel, an employee engaged in a rude outburst after finding that he was being denied a machine to accommodate a physical impairment. Timing alone was insufficient to establish a causal connection because the plaintiff had engaged in "intervening unprotected conduct" through an "angry outburst" around his co-workers. Id. The plaintiff in Kiel turned his protected activity into unprotected activity by being rude and disruptive to the work environment and that severed the causal connection. Id. Green did not engage in any such conduct such that Kiel would apply to our case.

Further, we have held that "a mere coincidence of timing can rarely be sufficient to establish a submissible case of retaliatory discharge." Kipp v. Mo. Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation omitted). Our decision in Kipp does provide considerably more tension with decisions like that in Peterson.

We need not decide the question of when or whether timing alone can establish a prima facie retaliation claim because we have said timing alone is insufficient to show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action. Kohler, 335 F.3d at 774 n.7 (8th Cir. 2003). Assuming Green has provided sufficient evidence supporting a prima facie retaliation claim, she failed to show a pretextual motive by Franklin National Bank to rebut its proffered legitimate, non-discriminatory reason for Green's termination.

This is how Green described her termination in her deposition:

> "A Wayne [Erdman] came back and said Linda [Green], I need you here tomorrow. And I says Wayne, can Lynn [Miller] cover for me? And he kept saying no, Lynn cannot. And that's when Wayne told me to turn my computer off and put away my drawer away.
> Q Did you consider your employment terminated at that point?
> A He didn't tell me. I said something to Wayne, I says – he says I am letting you go, or something like that. I says would you write the reason why you're letting me go down on a piece of paper? He says no, it's not professional."

Green argues that the reason Franklin National Bank gives for firing her is not supported by evidence. Further, Green argues that the reason for the termination is pretextual and, thus, hiding an unlawful retaliatory motive. To support her pretext argument, Green points to the same evidence she did to support the a finding of a causal connection.

Green cites the timing of her termination in relation to her complaint, Erdman's cancelling of her arranged coverage plans, the normalcy of allowing tellers to arrange coverage to attend classes, the preparation of the Markoe memos after the fact,[9] the

---

[9] Green alleges that the memos, in and of themselves, constitute an adverse employment action. However, such a claim is contrary to her position that the memos

missing performance review, the missing individual work plan, and past instances where Miller covered for Tellers. When a performance review like Green's is missing from a personnel file, that absence may create a presumption that the review would help her case. <u>Favors v. Fisher</u>, 13 F.3d 1235, 1239 (8th Cir. 1994); <u>Hicks v. Gates Rubber Co.</u>, 833 F.2d 1406, 1419 (10th Cir. 1987). However, this presumption does not help Green's argument in this case. Green was terminated for her failure to work assigned shifts. That she was otherwise an effective employee has no bearing on that stated reason for her termination.

Ultimately, we find that Green's proffered evidence in support of her retaliation claim is insufficient as a matter of law. While we view the evidence in the light most favorable to Green, there are several undisputed facts which demonstrate that Franklin National Bank had a legitimate, non-discriminatory reason for terminating Green. After Howard was terminated, his position was not filled. Reep had also recently resigned. This left Franklin National Bank in a severe staffing crunch. Consequently, the bank had a non-discriminatory reason for denying Green permission to take classes. When Green declined to work during her classes, the bank had a legitimate reason for terminating her employment.

Further, as a show of good faith in trying to persuade Green to not attend her classes, Erdman offered to reimburse Green for the cost of the classes. That the classes were free does not diminish Erdman's attempt to reach a compromise concerning the scheduling of classes. Before Green's termination, Franklin National Bank made several attempts to accommodate Green's class schedule. That those attempts failed is unfortunate, but tends to show that Franklin National Bank was not dedicated to terminating Green for retaliatory reasons.

---

were prepared as part of this litigation. While negative job reviews can constitute adverse employment actions, <u>Smith</u>, 109 F.3d at 1266, they cannot be if they were only prepared after she was fired. So, taking Green's allegations at face value, we cannot treat the memos as a separate adverse employment action in this case.

-21-

Green's arguments that other employees were allowed to take classes is unpersuasive because she is unable to show employees were able to take classes during a staffing crunch. The situation that Franklin National Bank was in at the time of Green's termination meant that the normal coverage arrangements were not available. As a result, Franklin National Bank has met its statutory burden in showing a non-discriminatory reason for terminating Green.

In the burden-shifting analysis, Green argues that this legitimate reason for her termination was pretextual. However, her evidence of pretext is entirely speculative. Green is unable to point to any significant evidence beyond mere timing to demonstrate a wrongful motive for her termination.

Franklin National Bank argues that Markoe's memos detailing Green's performance undermine Green's pretext argument. However, Green alleges that the Markoe memos about her poor performance may have been created after the fact. If the memos were actually prepared for this litigation, it would further support Green's pretext argument. Kim v. Nash Finch Co., 123 F.3d 1046, 1061 (8th Cir. 1997) (adding reports of poor performance by the employee was evidence of pretext). However, there is no evidence that these memos were prepared after the fact. Green is only speculating about when they were prepared. Nonetheless, we do not find that they help Franklin National Bank's arguments as to this claim because, as noted above, Green was terminated for missing assigned shifts, not for being ineffective at work.

Nonetheless, after reviewing the record, we cannot conclude that Green has raised an issue of material fact that Franklin National Bank's motives for her termination were pretextual. The staff shortage at that time is undisputed in the record. That Erdman attempted to compromise with Green is also not rebutted. Green's speculation about an ulterior motive by Franklin National Bank is

unsupported and contradicted by other undisputed facts in this case. Consequently, Green's retaliation claim fails.

Insofar as we have treated Green's whisteblowing claim as analogous to her retaliation claim, we affirm the district court's judgment on that claim as well.

## VI. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

LAY, Circuit Judge, concurring in part and dissenting in part.

Although I concur in large part with the conclusions offered by the majority, I respectfully dissent on the issue of Green's federal retaliation and Minnesota state whistleblower claims. In addition to temporal proximity, there is further circumstantial evidence suggesting Franklin National Bank's offered reason for Green's termination – that she refused to work her regularly scheduled shift – is merely pretextual.

Specifically, Green provided deposition testimony that on August 26, Bank Vice President Wayne Erdman informed her that her August 27 replacement from the Blaisdell branch had been cancelled. Green subsequently made repeated requests to have another bank employee from the Washington Avenue office work her previously scheduled, but since reassigned, work shift on August 27. Green claims that Erdman denied her request and told her that she was being let go, while also refusing to provide Green with a written explanation for her termination. This version of events calls into question whether Green actually refused to work on August 27, thereby undercutting the very essence of the bank's proffered legitimate, nondiscriminatory reason for Green's termination.

-23-

Taking Green's testimony to be true, as we must, a reasonable jury could easily infer pretext based on the fact that Green never refused to work on August 27, as the bank alleges.  Therefore, I respectfully dissent.

_____